*3*

**Stuart B. Wolfe (SBN 156471)**
*sbwolfe@wolfewyman.com*
**Jonathan C. Cahill (SBN 287260)**
*jccahill@wolfewyman.com*
**WOLFE & WYMAN LLP**
**980 9th Street, Suite 1750**
**Sacramento, California 95814**
**Telephone:  (916) 912-4700**
**Facsimile:   (916) 329-8905**

**Attorneys for**
**OCRE Investment Fund 1 LLC**

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>DEBORA LEIGH MILLER-ZURANICH<br><br>　　　　　Debtor and Debtor-in-Possession, | Case No.: 19-21640-B-11<br>Chapter 11<br>Hon. Christopher D. Jaime<br><br>Docket Control No.: WW-2<br><br>**DECLARATION OF JONATHAN C. CAHILL IN SUPPORT OF MOTION TO CONVERT OR DISMISS CHAPTER 11 BANKRUPTCY CASE**<br><br>**Hearing**:<br>Date:   October 8, 2019<br>Time:  2:00 PM<br>Ctrm: 7, 7th Floor |

I, JONATHAN C. CAHILL, declare as follows:

1.  I am an attorney at law duly licensed to practice in all of the courts in the State of California and the Eastern District of California, and I am an associate with the law firm of WOLFE & WYMAN LLP, attorneys of record for OCRE INVESTMENT FUND 1 LLC, (hereinafter "OCRE").  I have personal knowledge of the following, and if called as a witness, I could and would competently testify thereto.  I make this declaration in support

1

**DECLARATION OF JONATHAN C. CAHILL IN SUPPORT OF MOTION TO CONVERT OR DISMISS CHAPTER 11 BANKRUPTCY CASE**

3459801.1

WOLFE & WYMAN LLP
ATTORNEYS & COUNSELORS AT LAW
W&W

1   of the OCRE's Motion to Convert of Dismiss Chapter 11 Bankruptcy Case.

2.  On August 21, 2019, I transmitted via email to Debtor's counsel a cash collateral stipulation and motion to approve the same. I have followed up numerous times with Debtor's counsel, and yet no executed stipulation has been forthcoming. The last reminder to Debtor's counsel was sent September 20, 2019.

3.  To date, OCRE has not provided Debtor with authorization to utilize its cash collateral. Based on my review of the docket for the instant case, it does not appear that Debtor has obtained a court order authorizing the use of OCRE's cash collateral.

4.  On August 8, 2019, I attended the initial 341(a) Meeting of Creditors in the instant case. Attached hereto as **Exhibit 6** is a true and correct copy of the transcript from the 341(a) Meeting of Creditors held August 8, 2019.

5.  On August 22, 2019, I attended the initial 341(a) Meeting of Creditors in the instant case. Attached hereto as **Exhibit 7** is a true and correct copy of the transcript from the 341(a) Meeting of Creditors held August 22, 2019.

6.  On August 22, 2019, I received from Debtor's counsel via email an 'accounting' related to the Property. While crude, this document appears to confirm Debtor is utilizing OCRE's cash collateral to make improvements to the Property without its consent. This document also suggests that the normal rental rate for the Property is $3,955.00 per month, which is discounted by $500.00 while improvements are underway, to a rate of $3,455.00. This conflicts with prior representations made by Debtor's counsel that the lease rate for the Property was $3,300.00. A true and correct copy of the 'accounting' I received from Debtor's counsel is attached hereto as **Exhibit 8**.

///
///
///
///
///

2

**DECLARATION OF JONATHAN C. CAHILL IN SUPPORT OF MOTION TO CONVERT OR DISMISS CHAPTER 11 BANKRUPTCY CASE**

WOLFE & WYMAN LLP
ATTORNEYS & COUNSELORS AT LAW

3459801.1

1  I declare under penalty of perjury under the laws of the United States that the foregoing is true and

2  correct, executed this 30th day of September 2019, at Sacramento, California.

3                                                        Respectfully submitted,

4  DATED:  September 30, 2019                  WOLFE & WYMAN LLP

5

6                                                        By:  ___/s/ Jonathan C. Cahill_____
                                                            STUART B. WOLFE
7                                                           JONATHAN C. CAHILL

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                         **PROOF OF SERVICE**

28                                                    3
_____
                **DECLARATION OF JONATHAN C. CAHILL IN SUPPORT OF MOTION TO CONVERT OR DISMISS**
                                      **CHAPTER 11 BANKRUPTCY CASE**

WOLFE & WYMAN LLP
ATTORNEYS & COUNSELORS AT LAW
W&W

3459801.1

## EXHIBIT "6"

## AUGUST 8, 2019 MEETING

1           OFFICE OF THE UNITED STATES TRUSTEE

2     COMPONENT OF UNITED STATES DEPARTMENT OF JUSTICE

3                  --oOo--

4

5   In Re:                        )
                                  )

6   DEBORA LEIGH MILLER-ZURANICH,   )No. 19-21640
                                  )

7        Debtor.              )
                                  )

8   _____ )

9

10          TRANSCRIPT FROM RECORDED PROCEEDINGS

11            341 MEETING OF CREDITORS

12

13                   --oOo--

14

15

16            CAMERON GULDEN, Presiding

17

18

19            SACRAMENTO, CALIFORNIA

20             AUGUST 8, 2019

21

22

23   Transcribed by:   Mary Ellen Edd, CSR No. 9755

24

25

```
 1              SACRAMENTO, CALIFORNIA, AUGUST 8, 2019
 2                         --oOo--
 3         UNID. FEMALE:  It's recording.
 4         MR. GULDEN:  All righty.  Hey, real quick, before
 5   we get started though, could somebody help me out with the
 6   pronunciations here?
 7         MS. MILLER-ZURANICH:  I'm Debbie Miller-Zuranich.
 8         MR. GULDEN:  Zuranich, okay.  And you're the
 9   attorney, Peter Cianchetta (phonetic)?
10         MR. FELICIANO:  Lauro Feliciano appearing for Peter
11   today.  He's on --
12         MR. GULDEN:  What's your name, sir?
13         MR. FELICIANO:  Lauro, L-a-u-r-o.  And then last
14   name, Feliciano, F-e-l-i-c-i-a-n-o.
15         MR. GULDEN:  Okay.  All right.  So we can get
16   started, this is the 341 Meeting of Creditors, Debtor Debora
17   Miller-Zuranich, Case No. 19-21640.  My name is Cameron
18   Gulden.  I'm an attorney here in the Office of the United
19   States Trustee.
20         Ms. MILLER-ZURANICH, please raise your right hand.
21         Do you swear the testimony you're about to give
22   will be the truth and nothing but the truth, so help you
23   God?
24         MS. MILLER-ZURANICH:  Yes.
25         MR. GULDEN:  Thank you.  Okay.  Um, I've read the
```

```
 1   IDI notes.  It just looks like a Chapter 13 case, converted
 2   to Chapter 11.
 3            Counsel, why did it convert to Chapter 11?
 4            MR. FELICIANO:  I think there were issues with
 5   the -- the debtor had a trust on the Lake Tahoe prop- --
 6   yeah, the Lake Shore -- was it Lake Tahoe property?
 7            MS. MILLER-ZURANICH:  Yeah.
 8            MR. FELICIANO:  Yeah, the Lake Tahoe property.  So
 9   it was mostly all property liens.  I don't think there's any
10   unsecured debts.  But the plan was to -- well, based on the
11   checklist, was to sell the Merlin and handle all those.
12            And then my understanding is Peter believed that
13   Chapter 11 would handle that, or the easiest --
14            MR. GULDEN:  Okay.
15            MR. FELICIANO:  -- path to that.
16            MR. GULDEN:  Okay.  It looks like, you know, we
17   requested a lot of documents, the standard documents before
18   the initial debtor interview.  It doesn't look like really
19   any were provided.  Do you know if any of those have been
20   provided yet?
21            MS. MILLER-ZURANICH:  Yeah, I turned all those in.
22            MR. FELICIANO:  Yeah.  I've got the checklist with
23   me now.  So a lot of it was attached to this.  It won't help
24   you much.  It's neither here nor there.  But, um, one of the
25   attachments -- let me just go through that really quick.
```

1      MS. MILLER-ZURANICH: I -- I can scan and send them

2 to you, but I don't know if you're there to get them from

3 where you are right now.

4      MR. GULDEN: Yeah. Probably not helpful right now.

5 But, I mean those are the copies you were bringing for us or

6 your copies or --

7      MR. FELICIANO: I believe these are originals that

8 we received. I've got the insurance declarations, this, uh,

9 um, bank account statements, um, and the mortgage

10 statements, tax returns.

11      MR. GULDEN: Okay. Any of the insurance policies

12 listed the U.S. Trustee for noticing purposes?

13      MS. MILLER-ZURANICH: Well, I don't think these

14 copies -- these are -- this is before that was requested,

15 these copies that he has. So they've since been addressed.

16      MR. GULDEN: Okay. So -- okay. So we just need to

17 make sure that all the documents requested are provided to

18 our office --

19      MR. FELICIANO: It's on the record.

20      MR. GULDEN: -- yeah. And Michelle Forest, I

21 guess, is the analyst in this case, so it would probably be

22 best to see that they get sent to her as soon as possible.

23      MR. FELICIANO: Got it.

24      MR. GULDEN: Okay. Since the case was filed as a

25 Chapter 13 earlier on, converted on July 3rd, is anything

1  changed in that time in regards to schedules, or are they

2  still true, accurate, and complete to the best of your

3  knowledge?

4          MS. MILLER-ZURANICH:  Yes.

5          MR. GULDEN:  Which one?

6          MS. MILLER-ZURANICH:  They're accurate.  Sorry.

7          MR. GULDEN:  Okay.  No changes --

8          MS. MILLER-ZURANICH:  I apologize.

9          MR. GULDEN:  Okay, no changes, that's fine.

10         So I'm just going to have -- oh, sorry.  Who else

11  is --

12         MR. CAHILL:  Yes.  Jonathan Cahill of Wolfe Wyman

13  on behalf of OCRE Investment Fund I, LLC.  We're the

14  lienholder on the Merlin property.

15         MR. GULDEN:  Okay, gotcha.  Sorry about that.

16         MR. CAHILL:  Not a problem.

17         MR. GULDEN:  All right.  So your -- your primary

18  residence is at 9369 Newington Way in Elk Grove; is that

19  right?

20         MS. MILLER-ZURANICH:  Yes.

21         MR. GULDEN:  Okay.  I see -- okay.  I guess the --

22  the more I understand, tell me if I'm wrong, the plan is to

23  continue to rent out the Lake Shore Boulevard property and

24  to sell the Merlin Court property?

25         MS. MILLER-ZURANICH:  Yes.

```
 1          MR. GULDEN:  Okay.  All right.  Ms. Zuranich, a
 2    little bit about that.  And I'm just going to ask a few
 3    questions (unintelligible) from the schedule.  Then if
 4    counsel has any questions after that, you can feel free.
 5          Let's see.  With regards to the Merlin -- no, let's
 6    start with Lake Shore Boulevard.  549 Lake Shore Boulevard,
 7    Unit 29, Incline Village.  Um, you listed the current value
 8    as $1,583,000.  How did you come up with that value?
 9          MS. MILLER-ZURANICH:  Uh, there was an appraisal.
10    It's on a schedule or -- it was in the paperwork that we
11    completed.
12          MR. GULDEN:  There was an appraisal?  When was
13    that?
14          MS. MILLER-ZURANICH:  Uh, I don't recall the date,
15    but that's where we got the value from.
16          MR. GULDEN:  And do you recall like the year or --
17          MS. MILLER-ZURANICH:  It was --
18          MR. FELICIANO:  (Unintelligible/inaudible).
19          MS. MILLER-ZURANICH:  -- um, I believe it was
20    twenty -- I'm not sure of the year.  But we provided that.
21          MR. GULDEN:  To --
22          MS. MILLER-ZURANICH:  To my attorney.
23          MR. GULDEN:  Okay.  Well, maybe he can tell me.
24          MR. FELICIANO:  Yeah, I'm looking through here.
25          MS. MILLER-ZURANICH:  It may be written on here, I
```

1  believe.

2          I'll show you.  I can look -- let me -- I might

3  have it here.  2016.

4          MR. GULDEN:  Okay.  And that's for the whole

5  property and for the unit you own, you have an appraisal,

6  'cause you listed, I guess, for what the condo that you own,

7  395,750?

8          MS. MILLER-ZURANICH:  Pardon me?

9          MR. GULDEN:  So Schedule A.

10          MR. FELICIANO:  Yeah.

11          MS. MILLER-ZURANICH:  This is for the prop- -- the

12  condo property at Incline Village, their appraisal.

13          MR. GULDEN:  Right.  Current value of the entire

14  property, $1,583,000.  Current value of the property portion

15  you own, $395,750.  Is that --

16          MS. MILLER-ZURANICH:  Twenty-five percent.

17          MR. FELICIANO:  Yeah, it's split four ways.

18          MR. GULDEN:  Okay.  Unit 29, what -- what is -- so

19  the value for that one condo is $1,583,000?

20          MS. MILLER-ZURANICH:  Yes.  Well, that's as of

21  2016, so --

22          MR. GULDEN:  Okay.

23          MS. MILLER-ZURANICH:  -- the current value could be

24  higher.

25          MR. GULDEN:  Sure.  Or lower, if  --

1          MS. MILLER-ZURANICH:  Or lower.

2          MR. GULDEN:  -- probably higher considering where

3 it is --

4          MS. MILLER-ZURANICH:  Yeah.

5          MR. GULDEN:  -- but yeah.

6          MS. MILLER-ZURANICH:  I'm not really positive on

7 that, but I own -- it's between four.  So it's --

8          MR. GULDEN:  Okay.  Can you explain that to me,

9 please?

10          MS. MILLER-ZURANICH:  There's four siblings.

11 There's four of us, so it's, um, I -- I have 25 percent

12 interest in it.

13          MR. GULDEN:  Okay.  Is there a tenant in there

14 right now?

15          MS. MILLER-ZURANICH:  No.

16          MR. GULDEN:  Oh.  When was the last time there was

17 a tenant in there?

18          MS. MILLER-ZURANICH:  This is for, um, this is like

19 vacation rentals.

20          MR. GULDEN:  Okay.  Just vacations, okay.  Well,

21 what's the monthly payment on that?

22          MS. MILLER-ZURANICH:  I am not positive of the

23 amount.  I believe it's in that.  I believe it's around

24 4400.

25          MR. GULDEN:  Okay.

1          MS. MILLER-ZURANICH:  But I'm not positive.

2          MR. GULDEN:  And that's your payment or --

3          MS. MILLER-ZURANICH:  No.  No, that's for the --

4    that's for the -- not my portion.  It's the total payment.

5          MR. GULDEN:  The total monthly mortgage payment is

6    about 4400?

7          MS. MILLER-ZURANICH:  I believe.  I'm, not positive

8    on the exact amount.  Oh, yes, that's it.  Four thousand.

9    Sorry.

10          MR. FELICIANO:  Four thousand thirty.

11          MR. GULDEN:  Okay.  And are you current with

12    payments on that property?

13          MS. MILLER-ZURANICH:  We are not.

14          MR. GULDEN:  When was the last time you made a

15    payment?

16          MS. MILLER-ZURANICH:  Um, this is behind, it's 26

17    months behind.  Wait.  It's (unintelligible).

18          MR. FELICIANO:  Monthly 26, yeah.

19          MS. MILLER-ZURANICH:  Twenty-six.

20          MR. GULDEN:  Okay.  How often do you rent that unit

21    out?

22          MS. MILLER-ZURANICH:  Well, it's rented, um,

23    through the summer, the summer months, and then winter

24    months.  So I would say, um, May through like October, our

25    peak -- it's rented all year, but the highest season would

1  be, I would say May through like September, and then winter

2  months.

3          MR. GULDEN:  Okay.  How much do you rent it out

4  for?

5          MS. MILLER-ZURANICH:  It varies, um, like just

6  depends on the season.  I believe it's -- I believe it's

7  rented for 350 to 400 a night.  I don't handle that portion,

8  so I'm not really sure.  I have four -- three other

9  siblings, so we're all in this together.

10          MR. GULDEN:  Well, it would be pretty important for

11  you to have detailed financial information for all these

12  properties for your Chapter 11 case --

13          MS. MILLER-ZURANICH:  Okay.

14          MR. GULDEN:  -- plan together --

15          MS. MILLER-ZURANICH:  Certainly.

16          MR. GULDEN:  -- on the disclosure statement.

17          Um, do you know like about how much that brings in,

18  say, per year or --

19          MS. MILLER-ZURANICH:  Anywhere, um, I believe it

20  was between 70 and 80 thousand per year.

21          MR. GULDEN:  So if you were -- if you were bringing

22  in 70 to 80 thousand per year, why haven't you made a

23  payment in over two years?

24          MS. MILLER-ZURANICH:  Well, the property, we've

25  been rebuilding all of these since they've never been

10

 1  updated, and so we had to bring them all current through

 2  renovations.  So it was very dated.

 3          MR. GULDEN:  Okay.  All right.  And then the other

 4  property, 30 Merlin Court in Oakland.  Let's see here.  So

 5  that one you've listed as -- let's see.  Current value

 6  $950,000.  Was there an appraisal on that one as well?

 7          MS. MILLER-ZURANICH:  There was.  I don't know the

 8  date on that one.  I believe it was 2017, 2018?

 9          MR. GULDEN:  Okay.

10          MS. MILLER-ZURANICH:  Let me see.  I don't --

11          MR. GULDEN:  Do you own a fourth of that one as

12  well?

13          MS. MILLER-ZURANICH:  Yes.

14          MR. GULDEN:  All right.  When's the last time you

15  made a payment on that property?

16          MS. MILLER-ZURANICH:  Um, I believe it's been 11

17  months.  And -- I believe it's 10 or 11 months.

18          MR. GULDEN:  Okay.

19          MS. MILLER-ZURANICH:  I don't -- I don't have that

20  in front of me.

21          MR. GULDEN:  And how much is owed on that property?

22          MS. MILLER-ZURANICH:  I don't have the latest

23  payoff.

24          MR. GULDEN:  Just --

25          MS. MILLER-ZURANICH:  I --

1          MR. GULDEN:  -- approximately.

2          MS. MILLER-ZURANICH:  -- believe it's seven -- six

3   or seven hundred thousand.  I don't have the latest, I

4   apologize.

5          MR. FELICIANO:  Our proof of claim came in at

6   $694,587.75.

7          MR. GULDEN:  Okay, thank you.

8          MR. FELICIANO:  That's probably about seven hundred

9   at this point.

10         MR. GULDEN:  Okay.  And you said your plan is to

11  sell that property?

12         MS. MILLER-ZURANICH:  Yes.

13         MR. GULDEN:  Okay.  What steps are you taking to

14  sell that property?

15         MS. MILLER-ZURANICH:  It's -- it's being updated

16  currently.  And then also, we are -- we have people

17  interested.  We have, uh, an agent that we've sought out.

18  We're just waiting for approval --

19         MR. GULDEN:  Okay.

20         MS. MILLER-ZURANICH:  -- from the courts to be able

21  to do so.

22         MR. GULDEN:  So will there be some sort of motion

23  filed then, or will it be part of the plan?  Any --

24         MS. MILLER-ZURANICH:  It's --

25         MR. GULDEN:  -- thoughts on that, Counsel?  Or --

1          MR. FELICIANO:  Yeah.  We're -- we're -- Peter's

2    actually about to file a motion for that.  Just collecting

3    signatures, um, so that -- yeah, I've got signatures right

4    in front of me, so we're gonna get that.  I think the only

5    thing we need is a declaration that we're working on for the

6    client to get that attached to it.

7          MR. GULDEN:  All right.  And according to your

8    schedules at the time you filed them, you had about $200 in

9    your checking account; is that correct?

10          MS. MILLER-ZURANICH:  Yes.

11          MR. GULDEN:  And also according to your schedules,

12    you don't have any, um, (unintelligible) -- nope.  You have

13    no unsecured debt at all?

14          MS. MILLER-ZURANICH:  No.

15          MR. GULDEN:  Okay.  And what is the monthly payment

16    on the Merlin Court property?

17          MS. MILLER-ZURANICH:  It was 5500 or -- 5500, I

18    believe.

19          MR. GULDEN:  Okay.  All right.  And do you have a

20    tenant in that property now?

21          MS. MILLER-ZURANICH:  Yes.

22          MR. GULDEN:  Okay.  Two -- how long is that lease

23    for?

24          MS. MILLER-ZURANICH:  I don't have the terms of the

25    lease.  Um, I wasn't part of that.  Um, I believe it's month

1  to month now.  I'm not really sure, to be honest.

2          MR. GULDEN:  Okay.

3          MS. MILLER-ZURANICH:  I'll have to get a copy of

4  that.  My siblings --

5          MR. GULDEN:  What --

6          MS. MILLER-ZURANICH:  It's among all of us as

7  siblings.

8          MR. GULDEN:  Okay.  Well, who rents the place out?

9          MS. MILLER-ZURANICH:  Well, we all do together.

10  But I -- I've been ill, so they've taken over a lot of the

11  responsibility.

12          MR. GULDEN:  Okay.  How much --

13          MS. MILLER-ZURANICH:  Like the last --

14          MR. GULDEN:  -- is the monthly rent?

15          MS. MILLER-ZURANICH:  3300, I believe.  Should be

16  right on here.  I just don't have the figures in front of

17  me.

18          MR. FELICIANO:  About 3300.

19          MS. MILLER-ZURANICH:  Okay.

20          MR. GULDEN:  So mortgage payment is 5500, but the

21  rent is 3300?

22          MS. MILLER-ZURANICH:  Yes.  And then we were making

23  up the difference as a -- everybody was going to pull in

24  together, but we're remodeling the property is what's -- to

25  bring it to fair market value.

1       MR. GULDEN:  Okay.  Okay.  Counsel, do you have any
2   questions?

3       MR. KAHILL:  Yes.  Thank you.

4       Um, again, my name is Jonathan Kahill.  I represent
5   OCRE Investment Fund I, LLC, the lienholder on 30 Merlin
6   Court in Oakland.

7       Um, Ms. Miller-Zuranich, obviously, we've talked
8   about how the Merlin property is rented out.  Um, how long
9   has it been rented out?

10      MS. MILLER-ZURANICH:  I believe it's been a year.

11      MR. KAHILL:  And I know that you didn't know all
12  the terms of the lease, but do you know if -- if rent is due
13  on the 1st of the month or the 15th?

14      MS. MILLER-ZURANICH:  I -- I don't have the lease
15  in front of me, so I'm not really sure of the details.

16      MR. KAHILL:  Okay.  Do you know if that tenant is
17  current on the payments?

18      MS. MILLER-ZURANICH:  I -- I'm not -- I have to --
19  I'm not really sure.  I have to look into all of that.

20      MR. KAHILL:  Okay.  Um, do you know if they paid a
21  deposit?

22      MS. MILLER-ZURANICH:  I'm not sure of any of that.

23      MR. KAHILL:  Okay.  As to my client's loan, um, it
24  is in default, correct?

25      MS. MILLER-ZURANICH:  Is that to me?

1          MR. KAHILL:  Yes.

2          MS. MILLER-ZURANICH:  Oh.  Yes.

3          MR. KAHILL:  And you stated that the last time you

4    made a payment was about 11 months ago.  Looks like this

5    loan was funded the end of August of 2018.  Have you made

6    any payments on this loan?

7          MS. MILLER-ZURANICH:  Um, not that I'm aware of.

8          MR. KAHILL:  So earlier when we talked about the

9    monthly payment amount on the loan of 5500, and the rental

10   amount of 3300, uh, obviously, since you're not making the

11   5500 a month payment, what is the 3300 a month being used

12   for?

13         MS. MILLER-ZURANICH:  We're renovating the property

14   to bring it current.  The house was built in the '50s.

15         MR. KAHILL:  Okay.

16         MS. MILLER-ZURANICH:  So it's very dated.

17         MR. KAHILL:  Do you use a property management

18   company to lease the property?

19         MS. MILLER-ZURANICH:  No.

20         MR. KAHILL:  Now, when you originally took out the

21   loan in approximately 617,000, that was a refi that paid off

22   two loans, right?

23         MS. MILLER-ZURANICH:  Um, I'm not sure of the

24   details on that.

25         MR. KAHILL:  Okay.  Then you took out $90,000 of

1  equity, correct?

2       MS. MILLER-ZURANICH:  I -- I don't recall the exact

3  figures.

4       MR. GULDEN:  So, here, can I just pause for a

5  second?

6       MR. KAHILL:  Sure.

7       MR. GULDEN:  Mean, I'm not sure if we can keep

8  going, but, I mean, you have to be able to answer these

9  questions.  This is your bankruptcy case and your financial

10  documents and your properties.  You can't -- I mean, just

11  saying, "I don't know, I'm not sure," is not going to work

12  in bankruptcy.  So --

13       MS. MILLER-ZURANICH:  I just don't have everything

14  in front of me is what I'm saying, and -- that -- that's

15  what I'm saying.

16       MR. GULDEN:  Okay.  Well, we're going to need to

17  continue this meeting until a time where you do have

18  everything in front of you and can answer all the questions

19  being asked of you about the financial condition of your

20  case and your schedules and your properties.

21       MS. MILLER-ZURANICH:  Uh-huh.

22       MR. GULDEN:  So we'll pick a date at this -- you

23  can still ask whatever you want, Counsel, sorry for

24  interrupting, but let's just get through this and pick a new

25  date.

1          MR. KAHILL:  It's fine.  I -- I agree.  I mean,

2     it's -- if -- if it's just going to be "I don't know" to

3     every question, it's going to be a little hard.  I mean, I'm

4     going to ask what does that 90 -- that $90,000 was used for.

5          Do you have an idea of what it was used for?

6          MS. MILLER-ZURANICH:  Well, the money for the

7     renovating and such of the property.

8          MR. KAHILL:  So the 90,000 in August of 2018 was

9     used for renovations to the property, and then 3300 a month

10    has also been used for renovation of the property, correct?

11         MS. MILLER-ZURANICH:  Yes.

12         MR. GULDEN:  Do you have receipts for all those

13    renovations?

14         MS. MILLER-ZURANICH:  Um, I -- I'm not part of it.

15    I'm not responsible for the renovation portion.  But we, as

16    a family, I believe we do have everything.

17         MR. KAHILL:  Okay.  And, frankly, my questions get

18    more detailed from there.  So if we're going to continue it

19    anyway, I should just ask that we pick a date.

20         MR. GULDEN:  Yeah.  Let's do that.  Let's pick a

21    date in a couple weeks from now.  I'm going to get my

22    calendar.  You guys check yours.

23         MR. FELICIANO:  How long will it take you to get

24    the lease, the previously lease --

25         MS. MILLER-ZURANICH:  I didn't know I needed all

1   that, so I apologize.

2        MR. FELICIANO:  Assume it takes you long to get

3   that?

4        MS. MILLER-ZURANICH:  Um, I wouldn't think so.

5        MR. FELICIANO:  Okay.  Couple weeks?

6        MS. MILLER-ZURANICH:  I would -- I would say that

7   should be fine.  I -- I just didn't know that I needed to

8   bring that, so I'm sorry.

9        MR. GULDEN:  All right.  How about August 21st or

10  August 22nd at 10:00 o'clock?

11       MR. FELICIANO:  August 22nd looks like it's pretty

12  clear for Peter.

13       MR. GULDEN:  Okay.  Is that also good for

14  lienholder, COunsel?

15       MR. KAHILL:  Yes, that works for me.  Thank you.

16       MR. GULDEN:  Okay.  All right.  We will continue

17  this meeting till August 22nd at 10:00 a.m. and go off the

18  record now.

19       Somebody in there shutting off the recording or --

20       MR. FELICIANO:  Uh --

21       MS. MILLER-ZURANICH:  Just press this red button?

22       MR. GULDEN:  I guess, yeah.

23       (Proceedings concluded.)

24                      --o0o--

25

1                    CERTIFICATION AND

2                 DECLARATION OF TRANSCRIBER

3                        --o0o--

4         I, MARY ELLEN EDD, CSR, and a duly designated

5   transcriber, do hereby declare and certify under penalty of

6   perjury that I have transcribed recording(s) which total one

7   in number and cover a total of pages numbered 1 through 20

8   and which recording was duly recorded at Sacramento,

9   California, on the 8th day of August, 2019, and that the

10  foregoing pages constitute a true, complete, and accurate

11  transcription of the aforementioned recording(s) to the best

12  of my ability within the limits of the quality of the

13  recording(s).

14        I hereby declare that I am a disinterested person

15  in the above-captioned matter and have no interest in the

16  outcome of this proceeding.

17        Dated this 23rd day of September, 2019, at

18  Sacramento, California.

19

20              /s/ Mary Ellen Edd

21              MARY ELLEN EDD, CSR NO. 9755

22

23

24

25

# EXHIBIT "7"

## AUGUST 22, 2019 MEETING

1          OFFICE OF THE UNITED STATES TRUSTEE

2     COMPONENT OF UNITED STATES DEPARTMENT OF JUSTICE

3                    --o0o--

4

5  In Re:                        )
                                 )
6  DEBORA LEIGH MILLER-ZURANICH, )No. 19-21640
                                 )
7          Debtor.               )
   ------------------------------)

8

9

10        TRANSCRIPT FROM RECORDED PROCEEDINGS

11            341 MEETING OF CREDITORS

12

13                    --o0o--

14

15

16          CAMERON GULDEN, Presiding

17

18

19            SACRAMENTO, CALIFORNIA

20              AUGUST 22, 2019

21

22

23  Transcribed by:  Mary Ellen Edd, CSR No. 9755

24

25

1          SACRAMENTO, CALIFORNIA, AUGUST 22, 2019

2                        --o0o--

3          UNID. FEMALE:  We're on the record.

4          MR. GULDEN:  All right.  This is the continued 341

5   of Chapter 11 debtor, Debora Miller-Zuranich, Case

6   No. 19-21640.  My name is Cameron Goulden.  I'm a hearing

7   officer with the United States Trustee.

8          Before we start, Ms. Miller-Zuranich, raise your

9   right hand.

10         Do you swear the testimony you're about to give

11  will be the truth, nothing but the truth, so help you God?

12         MS. MILLER-ZURANICH:  Yes.

13         MR. GULDEN:  All right.  Thank you.

14         MS. MILLER-ZURANICH:  All right.  Thank you.

15         Okay.  So as a brief breakdown, this is the

16  continued meeting.  We've already gone over a fair amount

17  such as we were able, and we continued to give the debtor

18  time to kind of get up to speed on some of the financial

19  questions from her schedules.

20         Do you feel like you're ready to do that today?

21         MS. MILLER-ZURANICH:  Let's do it.

22         MR. GULDEN:  Okay.

23         MR. CIANCHETTA:  I wanted to confirm, because

24  Lauro, who -- my associate who was here last time, said that

25  you said you didn't get the documents.  So I confirmed with

1   Michelle Forest that all of the documents were in the IDI

2   file that we were supposed to provide to the U.S. Trustee.

3   She looked yesterday and said she would contact you and let

4   you know all those documents are there.

5          MR. GULDEN: Okay. Well, they weren't at the time.

6   I'm glad they're there now. That would --

7          MR. CIANCHETTA: I sent them to her like, I don't

8   know, three or four weeks ago.

9          MR. GULDEN: Okay. Great. Okay, thanks.

10         All right. So I've covered everything -- I really

11  just want to just talk about the properties, because that's

12  kind of where we were at.

13         Oh, and also, counsel for the lender here, what's

14  your name again, sir?

15         MR. KAHILL: Yes, Jonathan Kahill of Wolfe Wyman on

16  behalf of secured creditors OCRE Investment Fund I, LLC.

17         MR. GULDEN: Okay, thank you. All right.

18         So I'll just go through properties and ask my

19  questions, and then lender's counsel can ask his, and that

20  should be it.

21         MR. CIANCHETTA: Okay.

22         MS. MILLER-ZURANICH:

23         MR. GULDEN: Good. So three properties. The first

24  one is 9369 Newington Way. That's your primary residence?

25         MS. MILLER-ZURANICH: Yes.

1          MR. GULDEN:  Okay.  And you listed a current value
2    of $434,000 approximately?
3          MS. MILLER-ZURANICH:  Yes.
4          MR. GULDEN:  How did you come up with that number?
5          MS. MILLER-ZURANICH:  Um, I think we had a recent,
6    um, well, Zillow for one, and then appraisal.
7          MR. GULDEN:  Okay.  Do you know the approximate
8    date of that appraisal?
9          MS. MILLER-ZURANICH:  Oh, that was probably last
10   month.  I don't know the exact day.  A few weeks ago.
11         MR. GULDEN:  Oh, so -- okay, great.  And the
12   secured claim on that property is approximately 118,000; is
13   that right?
14         MS. MILLER-ZURANICH:  Um, 118, that sounds right.
15         MR. GULDEN:  Okay.  That's what you listed on your
16   Schedule D.  And that's just a single-family residence?
17         MS. MILLER-ZURANICH:  Yes.
18         MR. GULDEN:  All right.  Then we'll move on to
19   549 Lake Shore Boulevard, Unit 29, at Incline Village.
20   That's a vacation rental property; is that right?
21         MS. MILLER-ZURANICH:  Yes.
22         MR. GULDEN:  Okay.  And you said you own one-fourth
23   of that?
24         MS. MILLER-ZURANICH:  Yes.
25         MR. GULDEN:  All right.  And who owns the other

1  three-fourths?

2          MS. MILLER-ZURANICH:  My siblings.

3          MR. GULDEN:  Okay.  How many siblings?

4          MS. MILLER-ZURANICH:  Three.

5          MR. GULDEN:  Okay.  And for that one under

6  Schedule D, you listed approximate value of $950,000; is

7  that accurate?

8          MS. MILLER-ZURANICH:  The property value 950,000?

9          MR. GULDEN:  Oh, no, that's the secured -- yeah.

10          MR. CIANCHETTA:  That should be the secured claim.

11          MR. GULDEN:  Okay.  Well, let me take a look at

12  that real quick.

13          So on Schedule D for a secured claim, it says

14  796,736.58.  And then Schedule A, let's see.  That was the

15  value, the total value at one -- at about 1.5 million.  Is

16  that number right?

17          MS. MILLER-ZURANICH:  Uh, yes, I think that's --

18          MR. GULDEN:  Total value, and then your interest is

19  one-fourth of that.

20          MS. MILLER-ZURANICH:  Yes.

21          MR. GULDEN:  Okay.  So does the secured claim of

22  roughly 796, is that correct?

23          MS. MILLER-ZURANICH:  Yeah, whatever the number was

24  on there is what we -- it should be.

25          MR. CIANCHETTA:  At the time of filing, that was

1    the best number we had.  We understand the proof of claims
2    come in slightly higher.
3           MR. GULDEN:  Okay.  All right.  And can you
4    describe that property again to me?
5           MS. MILLER-ZURANICH:  It's a condominium.  Um, what
6    do you want to know?  It's a one, two, three-bedroom.
7           MR. GULDEN:  And when was the last time you made a
8    payment on that property?
9           MS. MILLER-ZURANICH:  That I -- we discussed that
10    last time.  I think it was -- it's been in default, um, --
11    it's on the schedule there.
12           MR. CIANCHETTA:  A little over a year ago, I
13    believe.
14           MS. MILLER-ZURANICH:  Yeah.  It's, um, I think
15    it -- no, I think it was -- it's on the schedule.  I think
16    it was 20 months or something like that.
17           MR. CIANCHETTA:  Let's see what we have.
18           MS. MILLER-ZURANICH:  We're going to pull it up.
19           MR. GULDEN:  Perfect.  I'm not sure what schedule
20    you're referring to.
21           MR. CIANCHETTA:  My battery died, so it's plugged
22    in over against the wall.
23           MR. GULDEN:  Okay, all right.  Let's see.  Okay.  I
24    think last time you said it'd been around 26 months since
25    your last payment.  Does that sound right?

1          MS. MILLER-ZURANICH:  That might be right.  I think

2    we looked at the documents when we were here last time.

3          MR. GULDEN:  Okay.

4          MS. MILLER-ZURANICH:  It should be on there.

5          MR. CIANCHETTA:  Hang on, let me get there.

6          MR. GULDEN:  Okay.  And what's the monthly payment

7    on that property?

8          MS. MILLER-ZURANICH:  I believe it's 4,000.

9          MR. GULDEN:  Okay.

10          MS. MILLER-ZURANICH:  Roughly.

11          MR. GULDEN:  And last time you said you had done

12    some remodeling on that property.  About how much did you

13    spend on the remodel project?

14          MS. MILLER-ZURANICH:  Well, we've been doing these

15    properties, um, like one's from the '50s, one -- well, let's

16    start with this one, because we're talking about this one.

17          MR. GULDEN:  Thank you.

18          MS. MILLER-ZURANICH:  This was built in the '70s,

19    so this is something my father's had for many years, and it

20    was never updated.  So we had to clean it out.  We had to do

21    the carpet.  We had to do, like literally updated, I should

22    say, and everyone there all remodeled, all updated.  Ours

23    was pretty historic.  So if that gives you -- same thing

24    with the Oakland property.  Like these properties were never

25    touched since inception of buying it in terms of plumbing

```
 1   and all of that.  And you can imagine, in a Tahoe area,

 2   doesn't look so good.

 3            MR. GULDEN:  (Unintelligible).

 4            MS. MILLER-ZURANICH:  Yeah.  And so same thing with

 5   the Oakland property.  It's extremely dated -- it was

 6   very dated.

 7            MR. GULDEN:  Okay.

 8            MS. MILLER-ZURANICH:  Like we had to empty all of

 9   these out.  We had to --

10            MR. GULDEN:  Okay.  Well, we'll get to that Oakland

11   property next.  But how much did you spend roughly on the

12   Incline Village property?

13            MS. MILLER-ZURANICH:  Um, I don't even know roughly

14   on the --

15            MR. CIANCHETTA:  We're putting together a list of

16   both properties, because --

17            MR. GULDEN:  Okay.

18            MR. CIANCHETTA:  Correct me if I'm wrong, but what

19   we discussed is your brother is the contractor?

20            MR. GULDEN:  No, my brother is the one -- I -- I've

21   been really sick for the last two years, like extremely

22   sick.  I've been diagnosed with a brain tumor.  I have like

23   nodules in my lungs and spleen.  So I couldn't -- he took

24   care of everything on my behalf.  So me knowing all the

25   figures, I wasn't physically involved as much as I would
```

1    love to be.

2           I have my health back, thankfully.  And that's why

3    we are where we are.  And that's why I just want to get the

4    property sold in Oakland.  I want to move forward and just

5    make this as smooth as possible and as short as possible.

6           MR. GULDEN:  Okay.  Okay.

7           MS. MILLER-ZURANICH:  So because of my health, I

8    needed help.  I couldn't clearly do this.  And it was just

9    fighting for survival.  I didn't know if I would survive.

10   Like I was not sick with my head.  So.

11          MR. GULDEN:  All right.  Sorry.

12          MS. MILLER-ZURANICH:  So that's why I can't give

13   you all the answers because, really, I was fighting for my

14   life versus fighting for a property or managing a property.

15   If that makes sense.

16          MR. GULDEN:  Okay.

17          MR. CIANCHETTA:  And then, on top of that, all of

18   the family members were pitching in and contributing --

19          MS. MILLER-ZURANICH:  Yeah, everybody was --

20          MR. CIANCHETTA:  -- to --

21          MS. MILLER-ZURANICH:  -- pitching in and doing

22   their part.  And it's just -- that's how it's always been

23   with my father.  We're a very close family, and that's just

24   understanding everyone takes care of everyone, and that was

25   it.  It's a family home.  He wants the grandkids in there,

1  all of that.  It's just --

2          MR. CIANCHETTA:  I also think a point of that is

3  you guys didn't necessarily account for everything you guys

4  chipped in.

5          MS. MILLER-ZURANICH:  No.  We just -- that's what

6  we do.

7          MR. CIANCHETTA:  So they don't know.  So we're

8  trying to piece that together.  That's the point of that.

9  We're trying to get that pieced together.  We'll --

10          MR. GULDEN:  Okay.

11          MR. CIANCHETTA:  -- get that to you as soon as

12  possible.

13          MR. GULDEN:  Okay.

14          MR. CIANCHETTA:  We'll get it to Mr. Kahill as

15  well, 'cause --

16          MR. GULDEN:  Right.

17          MR. CIANCHETTA:  -- it goes hand-in-glove with the

18  question of where did the cash, what did you spend the

19  90,000 on.

20          MS. MILLER-ZURANICH:  Yeah, I'm not going to be

21  able to -- I mean it's just --

22          MR. GULDEN:  Right.

23          MR. CIANCHETTA:  So I mean it's going to take us a

24  couple weeks to get that together.

25          MR. GULDEN:  Okay.  And so the general plan, if I

1   remember, is to -- to sell the Oakland property, continue to
2   rent out the Incline Village property, and get funds that
3   way for a Chapter 11 plan. Is that right, Counsel?
4           MR. CIANCHETTA: Correct.
5           MR. GULDEN: All right.
6           MR. CIANCHETTA: What we'd like to do in a nut
7   shell, sell the Oakland property, pay the secured claim,
8   take the excess proceeds, bring the HOA current and the
9   property taxes current, okay. And then work on the
10  refinancing.
11          Since that money is -- since that property is
12  co-owned by all four, and the Tahoe is co-owned by all four,
13  that's going to be a separate, and the debtor will
14  personally pay the income tax claim that was filed and the
15  two small credit card claims that were filed. Kind of
16  keeping the funds segregated; does that make sense?
17          MR. GULDEN: Sure.
18          MR. CIANCHETTA: We're not going to use the
19  proceeds from the sale of the -- the house --
20          MR. GULDEN: Right.
21          MR. CIANCHETTA: -- to pay her individual debts, if
22  you will --
23          MR. GULDEN: Right.
24          MR. CIANCHETTA: -- where there's two pieces of
25  property that have group debt.

1        MR. GULDEN:  Uh-huh.

2        MR. CIANCHETTA:  Does that make sense?

3        MR. GULDEN:  It does make sense.  And

4 (unintelligible) be done by a plan or otherwise?

5        MR. CIANCHETTA:  I believe we're going to propose a

6 plan.  I was hoping to have it done by the end of the month,

7 but I don't think -- I don't think that's --

8        MR. GULDEN:  Right.

9        MR. CIANCHETTA:  -- feasible.  I think -- I think

10 we can maybe get a plan on -- and I'm anticipating

11 hopefully -- hopefully, the property is -- we're at a motion

12 to sell before we even get the plan on.

13        MR. GULDEN:  Yeah.

14        MR. CIANCHETTA:  We're really pushing to get the

15 property sold in Oakland.

16        MR. GULDEN:  Right.

17        MR. CIANCHETTA:  Okay?

18        MR. GULDEN:  Do you have a broker right now?

19        MR. CIANCHETTA:  We have a broker.  I asked them to

20 go ahead and list it but put in the agent remarks "Subject

21 to Court approval."  And I'll have that motion, I've got it

22 halfway done.  I had my 30th anniversary, so I was gone for

23 a while.

24        MR. GULDEN:  Okay.

25        MR. CIANCHETTA:  So we're -- we're -- as soon as I

1  get the declaration back from the broker, we'll get it

2  listed.  Or get --

3           MR. GULDEN:  Get them employed.

4           MR. CIANCHETTA:  -- them employed.  And I think

5  I'll do that on an ex parte, because I think that way, we

6  can have it officially listed quickly.

7           MR. GULDEN:  Sure.  Right.  Sounds good.  Okay.

8           MR. CIANCHETTA:  And I'll coordinate with

9  Mr. Kahill on that.

10          MR. GULDEN:  Perfect.  All right.  So that just

11 leaves 30 Merlin Court in Oakland.  You already started

12 talking about that.  So last time, I think you said it was

13 appraised, you said 2017, 2018.  Were you able to pin that

14 down anymore?

15          MS. MILLER-ZURANICH:  Oh, I'm sorry, I apologize.

16 I think it was twenty -- twenty -- I don't know the exact

17 date.  Uh, I just wasn't there for that.  I -- uh --

18          MR. GULDEN:  Okay.

19          MR. CIANCHETTA:  Do I have a copy of that?

20          MS. MILLER-ZURANICH:  I don't know.  I know we gave

21 you -- we e-mailed you an appraisal.  I don't know if it was

22 for that or the --

23          MR. CIANCHETTA:  The only one I remember is the

24 other one.

25          MS. MILLER-ZURANICH:  If we had it, we e-mailed it

1  to you.

2          MR. GULDEN:  Okay.  I'm sure you can get that.

3          Let's see.  And when you said you also did

4  renovations.  You know what?  Maybe -- I don't know if, uh,

5  Mr. Kahill, is that right?

6          MR. KAHILL:  Uh-huh.

7          MR. GULDEN:  Maybe I'll just turn it over to you on

8  this one, if you don't mind.  And then if you don't cover

9  anything, 'cause you probably have more detailed questions,

10  or --

11          MR. KAHILL:  Sure.

12          MR. GULDEN:  Okay.

13          MR. KAHILL:  I have no issue taking it that way.

14          Um, yeah.  So now that we're talking about the

15  Oakland property, and keeping in mind, I understand that you

16  haven't been deeply involved in the management of this

17  property --

18          MS. MILLER-ZURANICH:  Yeah.

19          MR. KAHILL:  -- as you've explained, um, if I could

20  ask you to kinda give me your best estimate, whatever detail

21  you can give me.

22          Um, to the extent I need to fill in details, I can

23  follow up with your counsel.

24          I know last time, we discussed, um, that, um, this

25  property is being leased out.  You didn't have a whole lot

1   of detail on the lease.  But your counsel did provide a copy

2   of it to me.  Um, and it looks like it's being leased out

3   for $3,955 a month, correct?  Does that sound about right?

4           MS. MILLER-ZURANICH:  That's it that we have, um,

5   here where it's because we're renovating -- we were

6   renovating it such that the rent was lowered to compensate

7   that while they're in there.  It's just degrading, I believe

8   that was between -- my brother took care of all that for me.

9           MR. KAHILL:  So the --

10          MS. MILLER-ZURANICH:  So --

11          MR. KAHILL:  -- reduction of the $500 a month --

12          MS. MILLER-ZURANICH:  Yeah.

13          MR. KAHILL:  -- for the time that you're renovating

14  the property --

15          MS. MILLER-ZURANICH:  (Unintelligible) there.

16          MR. KAHILL:  And that may very well be.

17          MS. MILLER-ZURANICH:  Yeah.

18          MR. KAHILL:  Was there another lease signed about

19  that or any sort of legal documents --

20          MS. MILLER-ZURANICH:  Not on my --

21          MR. KAHILL:  -- signed about that, or --

22          MS. MILLER-ZURANICH:  -- I'm not sure --

23          MR. KAHILL:  -- was it just --

24          MS. MILLER-ZURANICH:  -- I'm not sure if that's --

25          MR. KAHILL:  Okay.  Um, and I believe that you

1  stated that there -- that you don't have a property

2  management company that --

3          MS. MILLER-ZURANICH:  No.

4          MR. KAHILL:  -- helps you.

5          Who collects the rents from the property?

6          MS. MILLER-ZURANICH:  The rents were -- it goes to

7  my brother, 'cause he's the one that's responsible.  I left

8  him in charge of taking care of everything.

9          MR. KAHILL:  Okay.  Um, and I know that, when you

10  refinanced the property and took out the loan, um, that is

11  the basis for my client's secured lien, there was $90,000

12  that you took out.  And previously you stated that was used

13  for renovations.

14          And I know that your counsel's going to get me an

15  accounting of that as best he can.

16          MS. MILLER-ZURANICH:  Uh-huh.

17          MR. KAHILL:  But can you tell me generally what

18  sort of renovations you did to the property?

19          MS. MILLER-ZURANICH:  Well, you have to picture a

20  property that's built in 1950.  It was full of just stuff,

21  like we had to clear it out literally.  We had to, you know,

22  fix leaks, like in the ceiling.

23          MR. KAHILL:  Uh-huh.

24          MS. MILLER-ZURANICH:  Just poor condition, I guess

25  I should say.

1        MR. KAHILL:  So, for example, did you replace the

2    cabinetry in the kitchen?

3        MS. MILLER-ZURANICH:  Oh, yeah.  There was -- the

4    kitchen was worked on.  All the electrical, plumbing --

5        MR. CIANCHETTA:  Let's -- let -- can -- can I help?

6        MR. KAHILL:  Sure, go for it.

7        MR. CIANCHETTA:  'Cause I do a lot of

8    construction-related stuff.  So let's just like walk through

9    the structure.  So was a new roof put on?

10       MS. MILLER-ZURANICH:  We have a new roof, yes.

11       MR. CIANCHETTA:  Okay.  And you had to replace

12   plumbing?

13       MS. MILLER-ZURANICH:  Yes.

14       MR. CIANCHETTA:  Extensively or just simple?

15       MS. MILLER-ZURANICH:  Yes, it was very dated, yeah.

16   There was leaks from all the plumbing.

17       MR. CIANCHETTA:  Okay.  So you replaced it with

18   copper pipe?

19       MS. MILLER-ZURANICH:  I believe it was -- I mean, I

20   don't know the (unintelligible) --

21       MR. CIANCHETTA:  Okay.

22       MS. MILLER-ZURANICH:  -- but I -- I wasn't there

23   for it.  But I know --

24       MR. CIANCHETTA:  And there was a lot of electrical?

25       MS. MILLER-ZURANICH:  Yes.

```
 1              UNID. MALE:  It's not electrical.

 2              MR. CIANCHETTA:  So tear the walls out to get to

 3  the electrical?

 4              MS. MILLER-ZURANICH:  Yes.

 5              MR. CIANCHETTA:  So there's new drywall?

 6              MS. MILLER-ZURANICH:  Yes.

 7              MR. CIANCHETTA:  New flooring?

 8              MS. MILLER-ZURANICH:  Yes.

 9              MR. CIANCHETTA:  Paint inside and out?

10              MS. MILLER-ZURANICH:  Yes.

11              MR. CIANCHETTA:  Um, cabinets, counter tops?

12              MS. MILLER-ZURANICH:  All of that.

13              MR. CIANCHETTA:  What kind of counter tops were put

14  in?

15              MS. MILLER-ZURANICH:  (Unintelligible).

16              MR. CIANCHETTA:  Do you know?

17              MS. MILLER-ZURANICH:  I don't know what kind.

18              MR. CIANCHETTA:  Okay.

19              MS. MILLER-ZURANICH:  But they were nicer,

20  obviously, than the original.

21              MR. CIANCHETTA:  Right.

22              MS. MILLER-ZURANICH:  Because the original, like

23  original --

24              MR. CIANCHETTA:  Bathrooms --

25              MS. MILLER-ZURANICH:  -- everything.
```

1          MR. CIANCHETTA:  -- remodeled, too?

2          MS. MILLER-ZURANICH:  Yeah.

3          MR. CIANCHETTA:  Both bathrooms?

4          MS. MILLER-ZURANICH:  Yeah.

5          MR. CIANCHETTA:  Okay.  What about the yard?

6          MS. MILLER-ZURANICH:  Yard needed a ton of work,

7     like it's a huge hill, like it goes up, way up.  And all of

8     that had to be cleared.  I mean tons of trees.  It's just a

9     lot of work.

10          MR. CIANCHETTA:  I assume the property goes up a

11    hill?

12          MS. MILLER-ZURANICH:  Yes.  It's a big property,

13    and we have to clear all the way to the top.  And so the

14    whole entire backyard was a disaster.  Like overgrown.

15          MR. CIANCHETTA:  Okay.  Like a code enforcement

16    nightmare?

17          MS. MILLER-ZURANICH:  Yeah, a lot of work.

18          MR. CIANCHETTA:  Okay.  So --

19          MS. MILLER-ZURANICH:  And clear out the home before

20    we could even --

21          MR. CIANCHETTA:  Right.

22          MS. MILLER-ZURANICH:  -- do that.

23          MR. CIANCHETTA:  So you cleared the property.

24    Front yard landscaped?

25          MS. MILLER-ZURANICH:  Front yard, yeah, we

1  maintained the whole front.

2        MR. CIANCHETTA:  Okay.  Did you have to replace any

3  cement outside, like sidewalk, driveway?

4        MS. MILLER-ZURANICH:  I'm not sure on that.

5        MR. CIANCHETTA:  Okay.  Did that help?

6        MR. KAHILL:  It did, thank you.  That's what I

7  would have had to go through, yes.

8        MR. CIANCHETTA:  Yeah.

9        MS. MILLER-ZURANICH:  Bottom line, a ton of work.

10        MR. KAHILL:  Okay.

11        MS. MILLER-ZURANICH:  A ton of clearing out and

12  work.

13        MR. KAHILL:  And so, obviously, you talked about

14  the 90,000 went toward that.  And I believe that last time

15  you stated that the net rent from the property since my

16  client's loan was taken out has been going towards these

17  ongoing renovations, correct?

18        MS. MILLER-ZURANICH:  Yes.

19        MR. KAHILL:  Okay.  Uh, who pays the utilities at

20  the property?

21        MS. MILLER-ZURANICH:  The tenant.

22        MR. KAHILL:  Do they pay all the -- all the

23  utilities, or are there a couple of the utilities that

24  the -- that you --

25        MS. MILLER-ZURANICH:  I believe -- I believe they

1  pay.

2         MR. CIANCHETTA:  You told me that you pay the

3  garbage.

4         MS. MILLER-ZURANICH:  Then --

5         MR. CIANCHETTA:  I think that's what was in the

6  document --

7         MS. MILLER-ZURANICH:  Then one of my siblings

8  probably paid the garbage.

9         MR. CIANCHETTA:  So one of the siblings is paying

10  the garbage.  The renter pays the rest of the utilities, the

11  usage ones.

12         MR. KAHILL:  Yeah, that's fairly typical.

13         And do you know if the tenant is current on

14  payments on the lease?

15         MS. MILLER-ZURANICH:  I believe, yeah.  Yes.

16         MR. KAHILL:  And I believe that there's a deposit

17  specified in the, um, in the lease agreement.  Do you know

18  who's holding the deposit?

19         MS. MILLER-ZURANICH:  I -- I do not.  I believe --

20         MR. CIANCHETTA:  We're opening -- we're going to

21  open an account specific to the Merlin property like you --

22         MR. KAHILL:  Uh-huh.

23         MR. CIANCHETTA:  -- and I had discussed, and we'll

24  get that deposit transferred in there.

25         MR. KAHILL:  Okay.  And I know that earlier, you

1   discussed possibly your brother being the contractor.  Did

2   he do the improvements on the Oakland property?

3          MS. MILLER-ZURANICH:  He's not a contractor.  I

4   don't think he -- I think he had people do the work.

5          MR. KAHILL:  Oh, okay.

6          MS. MILLER-ZURANICH:  He didn't do -- he's not a

7   contractor.

8          MR. KAHILL:  Gotcha, okay.  So --

9          MS. MILLER-ZURANICH:  He just had people -- he's

10  just (unintelligible) --

11         MR. KAHILL:  He coordinated.

12         MS. MILLER-ZURANICH:  He coordinated.  He --

13         MR. CIANCHETTA:  Okay, I misunderstood.

14         MS. MILLER-ZURANICH:  He knows those terms better

15  than I do.  (Unintelligible).

16         MR. KAHILL:  And I don't believe Schedule G

17  disclosed an executory contract, so that may be an amendment

18  that might be needed.

19         Um, and it looks like pursuant to Schedule I,

20  you're an administrative assistant at State Farm Insurance,

21  correct?

22         MS. MILLER-ZURANICH:  Yeah.

23         MR. KAHILL:  And it says the address is in Albany,

24  California.  That's in the Bay Area, right?

25         MS. MILLER-ZURANICH:  Yes.

1          MR. KAHILL:  Do you work out of that location?

2          MS. MILLER-ZURANICH:  I work out of both.  When I

3     got really sick, I worked from home.

4          MR. KAHILL:  Okay.

5          MS. MILLER-ZURANICH:  And so I just continued.  I

6     go back and forth.  Just depends on if I need coverage.

7          MR. GULDEN:  And, for the record, my brother lives

8     in Albany.  Okay, go on.

9          MS. MILLER-ZURANICH:  My (unintelligible) --

10          (Laughter.)

11          MS. MILLER-ZURANICH:  I like the weather better.

12     It's kind of a vacation when you sit in an office there --

13          MR. KAHILL:  Yeah.

14          MR. CIANCHETTA:  Are you in Reno or Las Vegas?

15          MR. GULDEN:  Reno.

16          MR. CIANCHETTA:  Okay.

17          MR. GULDEN:  Yeah.

18          MS. MILLER-ZURANICH:  Not too far.

19          MR. GULDEN:  No.

20          MR. KAHILL:  And then as to the refinance where my

21     client's loan originated from, best I can tell is that you

22     took out that loan in your name solely.  Um, and that the

23     property was transferred to you individually and then back

24     into the trust after that transaction, correct?

25          MS. MILLER-ZURANICH:  Yeah.  Yeah.

1      MR. KAHILL:  Okay.  And much like the Incline

2  Village property, do you own one-quarter of the interest in

3  that property?

4      MS. MILLER-ZURANICH:  Yes.

5      MR. KAHILL:  And after -- well, let's put it this

6  way.  Obviously, you discussed the extensive remodeling

7  you've done on this property.  Um, are there any further

8  work that needs to be done on the property?

9      MS. MILLER-ZURANICH:  I would have to talk to my

10 brother on that to see what's left or --

11     MR. CIANCHETTA:  I'll ask that in an e-mail to the

12 realtor as well.

13     MR. KAHILL:  Okay.  And do you know if taxes and

14 insurance on the property are current?

15     MS. MILLER-ZURANICH:  Insurance is current.  Taxes,

16 I can't recall if that comes out -- I'm not -- I think

17 there's one payment due, I believe, soon.

18     MR. CIANCHETTA:  So the April payment?

19     MS. MILLER-ZURANICH:  I believe.

20     MR. KAHILL:  Okay.  And you scheduled in Schedule B

21 potential claims against lenders regarding predatory loans,

22 usury and foreclosure issues.  Can you elaborate on what

23 that might mean?

24     MR. CIANCHETTA:  That's not your loan.  It's

25 another loan.

24

1    MR. KAHILL:  Is that the other loan, not my
2    client's loan?

3    MS. MILLER-ZURANICH:  The other loan.  Okay, yeah.

4    MR. CIANCHETTA:  That's not your client.

5    MR. KAHILL:  Okay.  That satisfies my inquiry.

6    MR. CIANCHETTA:  No, your loan was pretty
7    straightforward.  That other one was kind of hokey.

8    MR. KAHILL:  And you've never lived at the Merlin
9    property, correct?

10    MS. MILLER-ZURANICH:  Years ago, yeah.

11    MR. CIANCHETTA:  As a child?

12    MS. MILLER-ZURANICH:  Yeah.

13    MR. KAHILL:  Oh, okay.  We long time ago.

14    MR. CIANCHETTA:  Well --

15    (Multiple voices, unintelligible)

16    MR. CIANCETTA:  -- like five or six years ago,
17    right?

18    (Laughter.)

19    MR. CIANCETTA:  Not in the last year or two.

20    MR. KAHILL:  Right, right.  Geez.

21    MS. MILLER-ZURANICH:  What are you trying to say?

22    MR. KAHILL:  That's a tough crowd.

23    (Laughter.)

24    MR. KAHILL:  All right.  I think that pretty much
25    covers my -- my questions on the property.  Obviously, you

1  are working on cash collateral issues and (unintelligible)

2  brokery (phonetic) and things sold.  And as long as you're

3  accounting for cash collateral in the meantime, um, as well

4  as, you know, for example, deposit, et cetera, I think we

5  should get.

6          MR. CIANCHETTA:  So if we do have past-due taxes,

7  we'd like to get those caught up.

8          MR. KAHILL:  Yes.  And we can discuss some possible

9  cash collateral.

10          MR. CIANCHETTA:  Cash collateral, yeah.

11          MR. KAHILL:  Okay.

12          MR. GULDEN:  Okay.  So no further questions, I'll

13  conclude the meeting.  I wish I could reach over and turn

14  the recorder off.

15          MR. CIANCHETTA:  Hit the red button.

16          MR. GULDEN:  Yeah.

17          (Hearing concluded.)

18                        --o0o--

19

20

21

22

23

24

25

1                          CERTIFICATION AND

2                     DECLARATION OF TRANSCRIBER

3                          --o0o--

4        I, MARY ELLEN EDD, CSR, and a duly designated

5  transcriber, do hereby declare and certify under penalty of

6  perjury that I have transcribed recording(s) which total one

7  in number and cover a total of pages numbered 1 through 27

8  and which recording was duly recorded at Sacramento,

9  California, on the 22nd day of August, 2019,

10  and that the foregoing pages constitute a true, complete,

11  and accurate transcription of the aforementioned

12  recording(s) to the best of my ability within the limits of

13  the quality of the recording(s).

14        I hereby declare that I am a disinterested person

15  in the above-captioned matter and have no interest in the

16  outcome of this proceeding.

17        Dated this 23rd day of September, 2019, at

18  Sacramento, California.

19

20                /s/ Mary Ellen Edd

21                MARY ELLEN EDD, CSR NO. 9755

22

23

24

25

# EXHIBIT "8"

## ACCOUNTING

30 Merlin Ct

| | | |
|---|---|---|
| lease | $3,955.00 | |
| Discount During Improvements on Property | ($500.00) | |
| | $3,455.00 | |
| | | |
| March Income | $3,455.00 | Rent went towards Improvments |
| April Income | $3,455.00 | Rent went towards Improvments |
| May Income | $3,455.00 | Rent went towards Improvments |
| June Income | $3,455.00 | Rent went towards Improvments |
| July Income | $3,455.00 | Rent went towards Improvments |
| August Income | $3,455.00 | Rent went towards Improvments |

Utilities are paid by tenant

**STATE OF CALIFORNIA**     )
                                    )    **ss.**

**COUNTY OF SACRAMENTO**    )

I, Beverley Tomlin-Hill, declare:

I am employed in the County of Sacramento, State of California. I am over the age of 18 and not a party to the within action. My business address is 980 9th Street, Suite 2350, Sacramento, California 95814.

On September 30, 2019, I served the document(s) described as **NOTICE OF MOTTION AND MOTION TO CONVERT OR DISMISS CHAPTER 11 BANKRUPTCY CASE** on all interested parties in said action by placing a true copy thereof in a sealed envelope addressed as stated on the ATTACHED SERVICE LIST.

☒    **BY MAIL**: as follows:
        ☐    **STATE** - I am "readily familiar" with Wolfe & Wyman LLP's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Sacramento, California, in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐    **BY ELECTRONIC SERVICE** as follows: I, Name, whose e-mail address is Email@wolfewyman.com, caused such document(s) to be transmitted at time a.m./p.m. to the electronic mailing address of the addressee listed on the attached service list by use of electronic mail. The electronic service of the document(s) complied with California Rules of Court, Rule 2.251 in that it was pursuant to court order, local rule, stipulation of the parties or the consent of the addressee. A copy of the original document bearing original signatures will be available for inspection upon request per California Rules of Court, Rule 2.257. All addressees have been provided with the sender's electronic service address.

☒    **BY ELECTRONIC MAIL** as follows: I hereby certify that I electronically transmitted the attached document(s) to the U.S. District Court using the CM/ECF System for filing, service and transmittal of Notice of Electronic Filing to the CM/ECF registrants for this case. Upon completion of the electronic transmission of said document(s), a receipt is issued to the serving party acknowledging receipt by ECF's system, which will be maintained with the original document(s) in our office.

☐    **BY OVERNIGHT COURIER SERVICE** as follows: I caused such envelope to be delivered by overnight courier service to the offices of the addressee. The envelope was deposited in or with a facility regularly maintained by the overnight courier service with delivery fees paid or provided for.

☐    **BY FACSIMILE** as follows: I caused such documents to be transmitted to the telephone number of the addressee listed on the attached service list, by use of facsimile machine telephone number. The facsimile machine used complied with California Rules of Court, Rule 2004 and no error was reported by the machine. Pursuant to California Rules of Court, Rule 2006(d), a transmission record of the transmission was printed.

☒    **FEDERAL** as follows: I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made.

Executed on September 30, 2019, at Sacramento, California.

                                        Beverley Tomlin-Hill

**DECLARATION OF JONATHAN C. CAHILL IN SUPPORT OF MOTION TO CONVERT OR DISMISS CHAPTER 11 BANKRUPTCY CASE**

3459801.1

**SERVICE LIST**
**U.S. District Bankruptcy Court of California – Sacramento Division**
**Case No.: 19-2160**
**DEBORA LEIGH MILLER-ZURANICH**
**W&W File No. 1760-006**
**[Revised: August 2019]**

Deborah Leigh Miller-Zuranich
9369 Newington Way
Elk Grove, CA 95758

Tel: (916) 952-0116
Email:

Peter L. Cianchetta
8788 Elk Grove Blvd., Suite 2A.
Elk Grove, CA 95624

Tel: (916) 685-7878
Email: *plc@eqlaw.net*

Office of the U,S, Trustee
Cameron Gulden
300 Booth Street, #3009
Reno, NV 89509

Office of the United States Trustee
2500 Tulare Avenue, #1401
Fresno, CA 93721
Attn: Robin Tubesing

**Creditors:**

Crystal Shores East Association
P.O. Box 5311
Incline Villae, NV 89450

LVNV Funding, LLC
Resurgent Capital Services
P.O. HBox 10587
Greenville, SC 29603-0587

Washoe County Treasurer
P.O. Box 30039
Reno, NV 89520-3039

Internal Revenue Services
4330 Watt Avenue, SA-5210
Sacramento, CA 95821
Attn: Insolvency, Group 3

5

**DECLARATION OF JONATHAN C. CAHILL IN SUPPORT OF MOTION TO CONVERT OR DISMISS**
**CHAPTER 11 BANKRUPTCY CASE**

WOLFE & WYMAN LLP
ATTORNEYS & COUNSELORS AT LAW

3459801.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**
**U.S. District Bankruptcy Court of California – Sacramento Division**
**Case No.: 19-2160**
**DEBORA LEIGH MILLER-ZURANICH**
**W&W File No. 1760-006**
**[Revised: August 2019]**


<u>**SERVICE LIST**</u>


<u>**Creditor's cont'd**</u>

Hall of Mortgage Fund LLC
6200 E. Canyon Rim Road
Anaheim Hills, CA 92807

Joseph J. Miller Trust
9369 Newington Way
Elk Grove, CA 95758

Select Portfolio Services
P.O. Box 65250
Salt Lake City, UT 84165-0250

6

DECLARATION OF JONATHAN C. CAHILL IN SUPPORT OF MOTION TO CONVERT OR DISMISS
CHAPTER 11 BANKRUPTCY CASE

3459801.1