DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

**6 PAGES PLUS EXHIBITS (51 TOTAL PAGES)**
Dean T. Kirby, Jr.    090114
Roberta S. Robinson 099035
KIRBY & McGUINN, A P.C.
707 Broadway, Suite 1750
San Diego, California 92101-5393
Telephone: (619) 685-4000
Facsimile: (619) 685-4004

Attorneys for Creditor
Hall Mortgage Fund, LP

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No.    19-21640 |
| DEBORA LEIGH MILLER - ZURANICH | Chapter 7 |
|      Debtor. | DCN: DTK-2 |
| | DECLARATION OF RONDA McNEFF IN SUPPORT OF MOTION FOR IN REM RELIEF FROM AUTOMATIC STAY |
| | DATE:      December 3, 2019 |
| | TIME:      9:30 a.m. |
| | DEPARTMENT B COURTROOM 32 501 I Street, Sixth Floor Hon. Christopher D. Jaime |

I, Ronda McNeff, declare:

1.      I am the Director of Private Lending for Tellone Financial Services, the servicing agent for Hall Mortgage Fund, LP (the "Lender"). The loan is evidenced by a Promissory Note in the original principal amount of $700,000.00, dated as of

1

McNEFF DECLARATION IN SUPPORT OF MOTION FOR IN REM RELIEF FROM AUTOMATIC STAY

1    November 28, 2016. A copy of the Note is attached as Exhibit 1. The Note is secured

2    by a first priority Deed of Trust encumbering property located in a resort area, at 549

3    Lakeshore Blvd, Incline Village, Nevada 89451.

4      2.      The borrower named in the Note and Deed of Trust is "Debora L. Miller,

5    Successor Trustee of the Joseph J. Miller Living Trust, dated 10/08/2007." A copy of

6    the Deed of Trust is attached as Exhibit 2.

7      3.      At the time that the loan was made in November, 2016, I was provided

8    with a copy of a very lengthy document, dated as of October 8, 2007, entitled "[t]he

9    JOSEPH J. MILLER Living Trust." A copy of the relevant portions of this 100 page

10    document is attached as Exhibit 3. I was also provided with a copy of Joseph Miller's

11    Death Certificate, indicating that he passed away on September 7, 2012. A copy of the

12    Death Certificate is attached as Exhibit 4. I was not informed that the Trust

13    Agreement had been amended prior to Joseph Miller's death, but I later learned that

14    this was the case, as explained below.

15      4.      The last monthly payment on this loan was received in January, 2018 and

16    was applied to the installment due on June 1, 2017. The loan is also in default for

17    failure to pay real property taxes during the entire loan term. The total of those taxes,

18    not including any applicable penalties, appears to be $26,575.41. Hall Mortgage has

19    already been required to advance $12,521.03 in HOA assessments and there are now

20    delinquent assessments totaling in excess of $7,925.50. Due in part to constant

21    required postponements and required new notices of the trustee's sale, Hall Mortgage

22    has advanced foreclosure fees of $14,122.29. If the default is cured and the loan

23    reinstated, the maturity date will be December 1, 2021. The current balance of the

24

McNEFF DECLARATION IN SUPPORT OF MOTION FOR IN REM RELIEF
FROM AUTOMATIC STAY

1 loan today is approximately $847,684.38, not including attorney fees not yet billed to

2 Hall Mortgage.

3   5. From about the time that the loan was procured, I was in regular

4 communication with the Debtor's brother, John R. Miller. Based on these

5 communications, it was clear to me that John Miller, and not his sister Debora, was

6 making decisions with respect to the property.

7   6. Foreclosure of the Deed of Trust was first commenced by the recording

8 of a Notice of Default on April 6, 2018. At Mr. John Miller's request we delayed to set

9 a sale date, based upon his representation that a sale of property in Oakland, California

10 was pending, and that the sale proceeds would be used to cure the default on the

11 Incline Village property. The promised cure payment was never received.

12   7. Nevada law limits the number of times that a trustee's sale may be

13 postponed by announcement. After the third postponement, a new Notice of Trustee's

14 Sale must be issued. A new Notice of Trustee's Sale was recorded on August 24,

15 2018, scheduling the sale date for September 19, 2018. On the day before that sale, we

16 were notified that Debora Miller-Zuranich had filed a Chapter 13 bankruptcy petition,

17 Case No. 18-31023 in the Northern District of California. That chapter 13 case was

18 dismissed by an order entered on November 8, 2018. At that time, the trustee's sale

19 had already been scheduled by postponement to November 20, 2018 at 11:00 a.m.

20   8. On November 19, the day before the scheduled sale, I was contacted by

21 the foreclosure trustee, First American Title, which sent me a copy of the Debtor's

22 motion to vacate the dismissal. On the advice of our attorney, we instructed First

23 American to proceed with the pending sale notwithstanding the filing of this motion.

24

3

---

**McNEFF DECLARATION IN SUPPORT OF MOTION FOR IN REM RELIEF
FROM AUTOMATIC STAY**

9.     I then received a telephone call from John Miller. He said that he was contacting me because *his* property on Lakeshore Blvd. was being foreclosed upon. I referred him to our attorney.

10.     On November 20, 2018 at 11:38, I received an email from First American indicating that John Miller had contacted them and provided a new bankruptcy case number: 18-31252 in the Northern District of California. Later that day, it was determined that the trustee's sale auction had actually been completed at 11:25 a.m., and that the property had been sold to the highest bidder for $1,055,000.00. We later confirmed that the new Chapter 13 petition was filed at 11:12 a.m., thirteen minutes before the sale was completed. On our attorney's advice, we instructed First American to rescind the sale.

11.     That Chapter 13 bankruptcy, Case No. 18-31252, was dismissed on December 21, 2018. Because the sale had actually been completed, it was necessary to record another Notice of Trustee's Sale. At that point, we anticipated that Debora Miller-Zuranich would likely file yet another bankruptcy petition before the next scheduled sale date. Through our attorney, we contacted First American to confirm that they would proceed with a sale if that were to occur, based upon provisions of the Bankruptcy Code that no automatic stay would result from a new filing. First American agreed with that legal position but would not agree to conduct the sale if a new Chapter 13 petition were filed. We then attempted to obtain the same assurance from another foreclosure trustee in Reno, Nevada, but they would not agree to conduct the sale if a new Chapter 13 petition were filed.

/ / /

/ / /

4

Filed 11/04/19      Case 19-21640      Doc 174

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

12.     In the meantime, on January 11, 2019, another Chapter 13 petition was filed by Debora Miller-Zuranich, as Case No. 19-30034 in the Northern District of California. I was advised that this new Chapter 13 case was dismissed by an order entered January 28, 2019. After this dismissal, a new Notice of Trustee's Sale was recorded on February 15, 2019, scheduling the Trustee's sale to take place on March 18, 2019. On the day of that sale, we received notice that another Chapter 13 petition was filed that morning, as Case No. 19-21640, this time in the Eastern District of California. This is the current bankruptcy case. As a result, we were required to postpone, and eventually to cancel, the sale.

13.     Hall Mortgage did not take immediate action to obtain relief from the automatic stay in this latest bankruptcy case because I was contacted by Ms. Beverley Sopak, the Debtor's sister. Ms. Sopak told me that she and the other siblings of the Miller family were making arrangements for the Trust to sell the property to her and her husband Kelly Sopak.

14.     An escrow was opened at First American Title for what I was told would be the sale of the property by the Trust to the Sopaks. In connection with the purported sale, I received copies of three amendments to the trust which were apparently executed by Joseph Miller before his death. A copy of the "Third Amendment to the Joseph J. Miller Living Trust," dated June 2, 2012, is attached as Exhibit 5.

15.     Based on discussions with the Sopaks and the documentation (actually, the lack of same) relating to the purported sale of the Incline Village Property, it became clear to me that there was no actual purchase agreement between the Sopaks and the Trust, and that the Debtor, and the Sopaks, intended to transfer the property

5

---

McNEFF DECLARATION IN SUPPORT OF MOTION FOR IN REM RELIEF
FROM AUTOMATIC STAY

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

1   out of the trust without paying its reasonably equivalent value into the Trust. I was

2   also told by Ms. Sopak that the transfer was intended to put the property "in the name

3   of" the Sopaks.

4      16.     After consulting with its attorney, Tellone Financial Services, in its

5   capacity of servicing agent on behalf of Hall Mortgage, has determined that no title

6   insurance company, if fully apprised of the facts, would issue a lender's policy as to

7   any new or refinanced loan made in connection with a transfer of the Incline Village

8   property to one or more of the beneficiaries of the Joseph J. Miller Trust. We have

9   therefore, through our attorneys, advised the Sopaks that Hall Mortgage does not

10   intend to make such a loan.

11      I declare under penalty of perjury under the laws of the United States that the

12   foregoing is true and correct and that this Declaration was executed on <u>11/4/2019</u>

13   at Anaheim Hills, California.

     DocuSigned by:

     *Ronda McNeff*

     RONDA MCNEFF

6

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

Lo   Number: 1853-16

Broker Name: BANYON
CONSULTING GROUP, INC
NV License #: BRE#01898703

# BALLOON NOTE
### (FIXED RATE)

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

NOVEMBER 28, 2016                    ANAHEIM                    CALIFORNIA
[Date]                                    [City]                        [State]

549 LAKESHORE BLVD., #29, INCLINE VILLAGE, NEVADA 89451
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 700,000.00       (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is HALL MORTGAGE FUND, LP, A LIMITED PARTNERSHIP (CFL # 00977751)
I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of       6.250 %.
The interest rate required by Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS
### (A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the   1st   day of each month beginning on   JANUARY 1 2017   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   DECEMBER 1, 2021   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at   6200 E. CANYON RIM ROAD, SUITE 201, ANAHEIM, CALIFORNIA 92807

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments
My monthly payments will be in the amount of U.S. $ 4,310.02

MULTISTATE BALLOON NOTE (Fixed Rate)
US3290.NOT 09/30/16                    Page 1 of 4                    DocMagic eForms
                                                                     www.docmagic.com

Us3290.not.xml                                                       **Exhibit 1 Page 1 of 7**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sum already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

   **(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of     10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    10.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

   **(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

   **(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

   **(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

   **(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

MULTISTATE BALLOON NOTE (Fixed Rate)
Single Family--Freddie Mac UNIFORM INSTRUMENT
Form 3290 1/01      Page 2 of 4

DocMagic *eFerms*
www.docmagic.com

Us3290.not.xml

**Exhibit 1 Page 2 of 7**

## 8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of the Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that anyone of us may be required to pay all of the amounts owed under this Note.

## 9.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the rights to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note.  Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**MULTISTATE BALLOON NOTE (Fixed Rate)**
US3290.NOT  09/30/16                     Page 3 of 4                     *DocMagic eForms*
www.docmagic.com

Us3290.not.xml

**Exhibit 1 Page 3 of 7**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Debora L. Miller_ Successor Trustee of the Joseph J. Miller Living Trust

DEBORA L. MILLER                      (Seal)                                              (Seal)
                                     -Borrower                                          -Borrower

_____ (Seal)        _____ (Seal)
                       -Borrower                             -Borrower

_____ (Seal)        _____ (Seal)
                       -Borrower                             -Borrower

Loan Originator: VINCE FERRAGAMO, NMLSR ID 353562
Loan Originator Organization: TELLONE FINANCIAL SERVICES, INC.,
NMLSR ID 353562

*[Sign Original Only]*

**MULTISTATE BALLOON NOTE (Fixed Rate)**
US3290.NOT 09/30/16                    Page 4 of 4              DocMagic *eForms*
                                                               www.docmagic.com

Us3290.not.xml

**Exhibit 1 Page 4 of 7**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6



SPACE ABOVE FOR RECORDERS USE

# REVOCABLE TRUST RIDER

## DEFINITIONS USED IN THIS RIDER

(A) "Revocable Trust."     JOSEPH J. MILLER LIVING TRUST, DATED 10/08/2007

(B) "Revocable Trust Trustees."

trustee(s) of the Revocable Trust.

(C) "Revocable Trust Settlor(s)."

settlor(s) of the Revocable Trust signing below.

(D) "Lender." HALL MORTGAGE FUND, LP, A LIMITED PARTNERSHIP

(E) "Security Instrument." The Deed of Trust and any riders thereto of the same date as this Rider given to secure the Note to the Lender of the same date and covering the Property (as defined below).

(F) "Property." The property described in the Security Instrument and located at:

549 LAKESHORE BLVD., #29, INCLINE VILLAGE, NEVADA 89451

[Property Address]

**THIS REVOCABLE TRUST RIDER** is made this   28th   day of   NOVEMBER 2016        , and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

---

NEVADA REVOCABLE TRUST RIDER
Nev. Rev. Stat. § 247.110
NVIVRTR2.RDR 09/27/16       Page 1 of 3

*DocMagic eForms*
*www.docmagic.com*

**Exhibit 1 Page 5 of 7**

Nvivrtr2.rdr.xml

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and the Lender further covenant and agree as follows:

ADDITIONAL BORROWER(S) The term "Borrower" when used in the Security Instrument shall refer to the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and the Revocable Trust, jointly and severally. Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as "Borrower" on the first page of the Security Instrument, each covenant and agreement and undertaking of the "Borrower" in the Security Instrument shall be such party's covenant and agreement and undertaking as "Borrower" and shall be enforceable by the Lender as if such party were named as "Borrower" in the Security Instrument.

BY SIGNING BELOW, the Revocable Trust Trustee(s) accepts and agrees to the terms and covenants contained in this Revocable Trust Rider.

_Debora L. Miller, Successor Trustee of the Joseph J. Miller Living Trust_ (Seal)

DEBORA L. MILLER      -Borrower            (Seal) -Borrower

_____ (Seal) -Borrower         _____ (Seal) -Borrower

_____ (Seal) -Borrower         _____ (Seal) -Borrower

NEVADA REVOCABLE TRUST RIDER
Nev. Rev. Stat. § 247.110
NVIVRTR2.RDR 09/27/16       Page 2 of 3       *DocMagic eForms*
www.docmagic.com

**Exhibit 1 Page 6 of 7**

Nvivrtr2.rdr.xml

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

Lo    Number: 1853-16

# INTER VIVOS REVOCABLE TRUST
# AS BORROWER ACKNOWLEDGMENT

BY SIGNING BELOW, the undersigned, Settlor(s) of   JOSEPH J. MILLER LIVING TRUST, DATED 10/08/2007

acknowledge(s) all of the terms and covenants contained in this Security Instrument and in any rider(s) thereto and agree(s) to be bound thereby.

_Debra L. Miller Successor Trustee of the Joseph J. Miller Living Trust_

| _____ (Seal) | _____ (Seal) |
|---|---|
| -Trust Settlor | -Trust Settlor |

| _____ (Seal) | _____ (Seal) |
|---|---|
| -Trust Settlor | -Trust Settlor |

| _____ (Seal) | _____ (Seal) |
|---|---|
| -Trust Settlor | -Trust Settlor |

INTER VIVOS REVOCABLE TRUST AS BORROWER ACKNOWLEDGMENT
IVRT2.LSR 08/10/12

DocMagic *eForms*
www.docmagic.com

Ivrt2.lsr.xml

**Exhibit 1 Page 7 of 7**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

APN # 122-090-29

Recording Requested By:
First Centennial Title Company
1450 Ridgeview Dr. #100
Reno, NV 89509

When Recorded Return to:
Hall Mortgage Fund, IP
6200 E. Canyon Rim Road, Suite 201
Anaheim, CA 92807

**DOC #4751274**
10/04/2017 04:13:59 PM
Electronic Recording Requested By
FIRST CENTENNIAL – RENO (MAIN OF
Washoe County Recorder
Lawrence R. Burtness
Fee: $38.00  RPTT: $0
Page 1 of 20

SPACE ABOVE FOR RECORDERS USE

## Deed of Trust
(Title of Document)

### Please complete Affirmation Statement below:

☑ I, the undersigned, hereby affirm that the attached document, including any exhibits, hereby submitted for recording does not contain the social security number of any person or persons. (Per NRS 239B.030)

**THIS DOCUMENT IS BEING RE-RECORDED TO CORRECT THE LEGAL DESCRIPTION BY ADDING THE COMPLETE LEGAL DESCRIPTION FOR PARCEL 2**

☐ I, the undersigned, hereby affirm that the attached document, including any exhibits, hereby submitted for recording does contain the social security number of a person or persons as required by law:    (state specific law).

SIGNATURE

_____ Title Officer
TITLE

_____Lisa Quilici_____
Print Signature

This page added to provide additional information required by NRS 111.312 Sections 1-2 and NRS 239B.030 Section 4.

**This cover page must be typed or printed in black ink.**

(Additional recording fee applies)

SPACE BELOW FOR RECORDER _____

**Exhibit 2 Page 1 of 20**

**DOC # 4666203**
12/29/2016 11:34:03 AM
Requested By
HALL MORTGAGE FUND LP
Washoe County Recorder
Laurence R. Burtness - Recorder
Fee: $34.00 RPTT: $0.00
Page 1 of 18

Assessor's Parcel Number: 122-090-29

Recording Requested By:
HALL MORTGAGE FUND, LP

And When Recorded Return To:
HALL MORTGAGE FUND, LP C/O TELLONE FINANCIAL SERVICES, INC.
6200 E. CANON RIM ROAD, SUITE 201
ANAHEIM, CALIFORNIA 92807
Loan Number: 1853-16

Mail Tax Statements To:
DEBORA L. MILLER
30 MERLIN COURT
OAKLAND, CALIFORNIA 94605

Mortgage Broker's Name: BANYON CONSULTING
GROUP, INC.
NV License #: BRE#01898703

———————————[Space Above This Line For Recording Data]———————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated NOVEMBER 28, 2016 , together with all Riders to this document.
**(B)  "Borrower"** is DEBORA L. MILLER, SUCCESSOR TRUSTEE OF THE JOSEPH J. MILLER LIVING TRUST, DATED 10/08/2007

---

NEVADA—Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                          Page 1 of 15

DocMagic *eFerms*
www.docmagic.com

Borrower is the trustor under this Security Instrument.
(C)  "Lender" is  HALL MORTGAGE FUND, LP

Lender is a  CALIFORNIA LIMITED PARTNERSHIP                          organized
and existing under the laws of  CALIFORNIA
Lender's address is  6200 E. CANYON RIM ROAD, SUITE 201, ANAHEIM,
CALIFORNIA 92807
Lender is the beneficiary under this Security Instrument.
(D)  "Trustee" is  OLD REPUBLIC TITLE CO.
, LAS VEGAS, NEVADA 89117

(E)  "Note" means the promissory note signed by Borrower and dated  NOVEMBER 28, 2016
The Note states that Borrower owes Lender  SEVEN HUNDRED THOUSAND AND 00/100
                                    Dollars (U.S. $ 700,000.00          )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not
later than DECEMBER 1, 2021
(F)  "Property" means the property that is described below under the heading "Transfer of Rights in the
Property "
(G)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.
(H)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders
are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Planned Unit Development Rider
☐ Balloon Rider                ☐ Biweekly Payment Rider
☐ 1-4 Family Rider             ☒ Second Home Rider
☐ Condominium Rider            ☐ Other(s) [specify]

(I)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances
and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable
judicial opinions.
(J)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association or
similar organization.
(K)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions,
transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L)  "Escrow Items" means those items that are described in Section 3.
(M)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to,
or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

---

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT              DocMagic eForms
Form 3029  1/01                      Page 2 of 15        www.docmagic.com

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|  |  |  |
|---|---|---|
| COUNTY | of | WASHOE |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 122-090-29

which currently has the address of          549 LAKESHORE BLVD., #29
                                                              [Street]

INCLINE VILLAGE          , Nevada          89451          ("Property Address"):
[City]                                                   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

---

NEVADA--Single Family                                                    *DocMagic ⓔⓕⓞⓡⓜⓢ*
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    *www.docmagic.com*
Form 3029  1/01                              Page 3 of 15

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.    Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.    Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable

---

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                    Page 4 of 15

DocMagic *eFerms*
www.docmagic.com

Filed 11/04/19          Case 19-21640          Doc 174

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A8

by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the

---

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029 1/01          Page 5 of 15

DocMagic *eFerms*
www.docmagic.com

lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                              Page 6 of 15

*DocMagic eForms*
*www.docmagic.com*

Nv3029.doc.xm,

**Exhibit 2 Page 7 of 20**

lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                    Page 7 of 15

DocMagic *eF;orms*
www.docmagic.com

Instrument. including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.  Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender

---

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                          Page 8 of 15

*DocMagic eForms*
*www.docmagic.com*

**Exhibit 2 Page 9 of 20**

takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the

---

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                        Page 9 of 15

DocMagic *eForms*
www.docmagic.com

Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been

---

**NEVADA—Single Family**
**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3029 1/01**       **Page 10 of 15**

*DocMagic eForms*
*www.docmagic.com*

Nv3029.did.xml

**Exhibit 2 Page 11 of 20**

Filed 11/04/19      Case 19-21640      Doc 174

given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this

---

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029 1/01                **Page 11 of 15**

*DocMagic ℰℱℴ𝓇𝓂𝓈*
*www.docmagic.com*

Filed 11/04/19 Doc 174

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous

---

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                              Page 12 of 15

DocMagic *EForms*
www.docmagic.com

**Exhibit 2 Page 13 of 20**

Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lenders' election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

---

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029 1/01        Page 13 of 15

*DocMagic eForms*
*www.docmagic.com*

**25. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S.
$ one percent (1%) of the unpaid principal balance, but not
less than $400 or more than $900.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Debora L Miller_ Successor Truske of the Joseph J Miller Living Trust
_____(Seal)                    _____(Seal)
DEBORA L. MILLER          -Borrower                              -Borrower

_____(Seal)                    _____(Seal)
                    -Borrower                              -Borrower

_____(Seal)                    _____(Seal)
                    -Borrower                              -Borrower

Witness:                              Witness:

_____                    _____

**NEVADA--Single Family**
**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3029  1/01**                    **Page 14 of 15**

*DocMagic eForms*
*www.docmagic.com*

Nv3029.dot.xml

**Exhibit 2 Page 15 of 20**

——————————— [Space Below This Line For Acknowledgment] ———————————

State of ___NEVADA___

County of ~~WASHOE~~ ___Alameda___ ~~ss~~

   This instrument was acknowledged before me on ___12-8-2016___

                                              (date)

by ___DEBORA L. MILLER___

_____

_____

                   (name(s) of person(s))

MILTON L. HOWTON
COMM. # 2011680
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
MY COMM. EXP. APR. 9, 2017

        Signature of notarial officer

        _Notary Public_
        Title and Rank

   (Seal, if any)        My commission expires. ___4-09-2017___

Loan Originator: VINCE FERRAGAMO, NMLSR ID 353562
Loan Originator Organization: TELLONE FINANCIAL SERVICES, INC., NMLSR ID 353562

NEVADA—Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01            Page 15 of 15

DocMagic *eForms*
www.docmagic.com

DocuSign Envelope ID: 9599830A-99F2-4B46-AA74-8A8C744EA2A8

**EXHIBIT "A"**
**Legal Description**

All that certain real property situate in the City of **Incline Village**, County of **Washoe**, State of **NEVADA**, described as follows:

PARCEL 1:

An undivided one-thirty-second (1/32nd) interest, as tenants in common, in a portion of Lot III of Section 17, Township 16 North, Range 18 East, M.D.B.&M., described as follows:

Commencing at the quarter section corner on the East side of said Section 17; thence South along the Eastern line of said Section 17, a distance of 1072.5 feet to the meander corner of Lake Tahoe; thence along said meander line the four following courses and distances: North 88° West 138.6 feet; South 63° West 369.6 feet; South 78° West 488.4 feet and North 72° West 473.30 feet to the Southwest corner of the parcel conveyed to E.L. King, et al., by Deed recorded in Book 153, Page 182, Deed Records; thence along the West line of said King Parcel, North 489.66 feet, more or less, to the Southern right-of-way line of Nevada State Highway 28 as it now exists; thence South 84°48' West along the last mentioned line, 200.83 feet to the point of beginning; thence South 84°48' West along said Southern line of Nevada State Highway 28, a distance of 500.00 feet; thence South 300 feet, more or less, to Lake Tahoe; thence Easterly along Lake Tahoe to a line drawn South from the true point of beginning; thence North 410 feet, more or less, to the true point of beginning.

EXCLUDING, however, from said real property the air space and all structures and improvements located therein, over and above Parcels 1 through 32, as shown on that certain Licensed Survey filed on June 28, 1964, as File No. 2477, in the Official Records of Washoe County, State of Nevada.

PARCEL 2:

The fee title in and to the air space and all structures and improvements located therein, over and above Parcel 29 as designated on said Licensed Survey, and as more particularly described as follows:

A portion of Lot III of Section 17, Township 16 North, Range 18 East, M.D.B.&M., described as follows:

Exhibit "A"
Legal Description Continued:

Commencing at the quarter section corner on the East side of said Section 17; thence South along the Eastern line of said Section 17, a distance of 1072.5 feet to the meander corner of Lake Tahoe; thence along said meander line the four following courses and distances:  North 88° West 139.6 feet; South 63° West 369.6 feet; South 78° West 488.4 feet and North 72° West 473.30 feet to the Southwest corner of the parcel conveyed to E.L. KING, et al., by Deed recorded in Book 153, Page 182, Deed Records; thence along the West line of said King Parcel, North 489.66 feet, more or less, to the Southern right of way line of Nevada State Highway 28 as it now exists; thence South 84°48' West along the last mentioned line 209.89 feet; thence South 136.71 feet; thence North 65°99'27" West 16.83 feet to the true point of beginning of this description; thence North 65°59'27" East 30.00 feet; thence South 24°00'33" West 65.00 feet; thence South 65°53'2" East 30 feet; thence North 24°00'33" East 65.00 to the true point of beginning of this description, this parcel also known as Unit No. 9, Crystal Shores East.

PARCEL 3:

An easement to encroach into the area and estate herein above excluded for such improvements and living areas as are or may be constructed within the air space herein conveyed.

This legal was taken from prior Document No. 3811143.

APN:  122-090-29

End of Report

Exhibit 2 Page 18 of 20

Filed 11/04/19        Case 19-21640        Doc 174

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

Loan Number: 1853-16

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this 28th day of NOVEMBER, 2016 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to HALL MORTGAGE FUND, LP, A LIMITED PARTNERSHIP (the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at:

549 LAKESHORE BLVD., #29, INCLINE VILLAGE, NEVADA 89451

[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

MULTISTATE SECOND HOME RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3890 1/01
NV3890.RID 09/26/16          Page 1 of 2

DocMagic eForms
www.docmagic.com

NV3890.rid.xml

**Exhibit 2 Page 19 of 20**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

_Debora L. Miller_ Successor Truste of the Joseph T. Miller Living Trust (Seal)
DEBORA L. MILLER          -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                    -Borrower

**MULTISTATE SECOND HOME RIDER--Single Family**
**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3890 1/01**
**NV3890.RID  09/26/16**          Page 2 of 2

*DocMagic* *eForms*
*www.docmagic.com*

Nv3890.rid.xml

**Exhibit 2 Page 20 of 20**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

This

**Living Trust**

prepared for

**JOSEPH J. MILLER**

by

Steven E. Davidson

Attorney at Law
1300 Clay Street
Suite 600
Oakland, CA 94612

Telephone: (510) 527-6774
Fax: (510) 527-6747
Email: stevendavidsonesq@comcast.net

Copyright© 2007 Steven E. Davidson

**Exhibit 3 Page 1 of 13**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

# Table of Contents

# The JOSEPH J. MILLER Living Trust

## Introduction

Article One .......................................Creation of My Trust

Article Two......................................My Family

Article Three...................................Funding My Trust

## Providing for Me and My Family during My Lifetime

Article Four.....................................Administration of My Trust during
My Life

Article Five .....................................Insurance Policies and Retirement
Plans

## Providing for Me and My Family upon My Death

Article Six.........................................Administration of My Trust upon
My Death

Article Seven ...................................Distribution of My Tangible
Personal Property and Specific
Distributions

Article Eight ...................................The Common Trust

Article Nine ....................................Distribution of My Trust Property

Article Ten......................................Final Distribution Pattern

i

Exhibit 3 Page 2 of 13

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

Article Eleven...............................Methods of Distribution and Trust
Administration with Regard to
Minor and Disabled Beneficiaries

## Provisions Regarding My Trustee

Article Twelve................................The Resignation, Replacement, and
Succession of My Trustees

Article Thirteen..............................General Matters and Instructions
with Regard to the Trusteeship

## General and Administrative Provisions

Article Fourteen.............................My Trustee's Administrative and
Investment Powers

Article Fifteen..................................Definitions and General Provisions

Exhibit 3 Page 3 of 13

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

# Article Six

# Administration of My Trust upon My Death

## Section 1.  My Administrative Trust

Upon my death, my trust shall become irrevocable and my Trustee shall administer all trust property under the terms of this Article.  For convenience purposes, my Trustee may refer to my trust as an "Administrative Trust."

### a.  Taxpayer Identification Number

After my death, my Trustee shall apply for a separate taxpayer identification number ("TIN") for my trust.

### b.  Duration of My Administrative Trust

My Trustee shall continue my Administrative Trust for a reasonable period of time in order to comply with the provisions of this Article.

My Administrative Trust shall terminate when all of my trust property has been distributed in accordance with the subsequent Articles of this agreement.

## Section 2.  Payment of Expenses, Claims, and Taxes

My Trustee is authorized, but not directed, to pay the following:

Expenses of my last illness and my final arrangements, including, without limitation, burial or cremation, memorials, and funeral or memorial services of such kind as my Trustee, in its sole discretion, shall approve.  In exercising its discretion, my Trustee shall be guided, but not controlled, by the Instructions for My Final Arrangements contained in my Estate Planning Portfolio.

Legally enforceable claims against me or my estate.

Expenses with regard to the administration of my estate.

Exhibit 3 Page 4 of 13

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

# Article Nine

## Distribution of My Trust Property

### Section 1.    Division into Separate Shares

The remaining trust property shall be divided into as many shares as shall be necessary to create one equal share for each of my then living children, and one equal share for each of my deceased children who has then living descendants.

### Section 2.    Distribution of Trust Shares for My Living Children

The share of each child then living shall be distributed as follows:

#### a.    Distribution of Trust Share for KIMBERLEY D. MILLER

##### 1.    Outright Distribution

The trust share for KIMBERLEY D. MILLER shall be distributed outright and free of trust.

##### 2.    Distribution on the Death of KIMBERLEY D. MILLER

KIMBERLEY D. MILLER shall have the unlimited and unrestricted general testamentary power to appoint the entire principal and any accrued and undistributed net income of her trust share as it exists at her death.

KIMBERLEY D. MILLER shall exercise this general power of appointment by a valid last will and testament, a valid living trust agreement, or any other notarized written instrument signed by her.  In exercising this general power of appointment, she shall specifically refer to this power.

Exhibit 3 Page 5 of 13

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

KIMBERLEY D. MILLER shall have the sole and exclusive right to exercise the general power of appointment.

This general power of appointment specifically grants to KIMBERLEY D. MILLER the right to appoint property to her own estate. It also specifically grants to KIMBERLEY D. MILLER the right to appoint the property among persons, corporations, or other entities in equal or unequal proportions, and on such terms and conditions, whether outright or in trust, as she may elect.

To the extent this general power of appointment is not exercised, my Trustee shall divide the remaining trust property into separate shares for the then living descendants of KIMBERLEY D. MILLER, per stirpes.

If KIMBERLEY D. MILLER has no then living descendants, my Trustee shall divide the remaining trust property into separate shares for my then living descendants, per stirpes.

If I have no then living descendants, my Trustee shall distribute the remaining trust property as provided in Article Ten of this agreement.

**b.    Distribution of Trust Share for DEBORA L. MILLER**

**1.    Outright Distribution**

The trust share for DEBORA L. MILLER shall be distributed outright and free of trust.

**2.    Distribution on the Death of DEBORA L. MILLER**

DEBORA L. MILLER shall have the unlimited and unrestricted general testamentary power to appoint the entire principal and any accrued and undistributed net income of her trust share as it exists at her death.

DEBORA L. MILLER shall exercise this general power of appointment by a valid last will and testament, a valid living trust agreement, or any other notarized written

**Exhibit 3 Page 6 of 13**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

instrument signed by her. In exercising this general power of appointment, she shall specifically refer to this power.

DEBORA L. MILLER shall have the sole and exclusive right to exercise the general power of appointment.

This general power of appointment specifically grants to DEBORA L. MILLER the right to appoint property to her own estate. It also specifically grants to DEBORA L. MILLER the right to appoint the property among persons, corporations, or other entities in equal or unequal proportions, and on such terms and conditions, whether outright or in trust, as she may elect.

To the extent this general power of appointment is not exercised, my Trustee shall divide the remaining trust property into separate shares for the then living descendants of DEBORA L. MILLER, per stirpes.

If DEBORA L. MILLER has no then living descendants, my Trustee shall divide the remaining trust property into separate shares for my then living descendants, per stirpes.

If I have no then living descendants, my Trustee shall distribute the remaining trust property as provided in Article Ten of this agreement.

**c.    Distribution of Trust Share for BEVERLEY J. SOPAK**

**1.    Outright Distribution**

The trust share for BEVERLEY J. SOPAK shall be distributed outright and free of trust.

**2.    Distribution on the Death of BEVERLEY J. SOPAK**

BEVERLEY J. SOPAK shall have the unlimited and unrestricted general testamentary power to appoint the entire principal and any accrued and undistributed net income of her trust share as it exists at her death.

**Exhibit 3 Page 7 of 13**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

BEVERLEY J. SOPAK shall exercise this general power of appointment by a valid last will and testament, a valid living trust agreement, or any other notarized written instrument signed by her. In exercising this general power of appointment, she shall specifically refer to this power.

BEVERLEY J. SOPAK shall have the sole and exclusive right to exercise the general power of appointment.

This general power of appointment specifically grants to BEVERLEY J. SOPAK the right to appoint property to her own estate. It also specifically grants to BEVERLEY J. SOPAK the right to appoint the property among persons, corporations, or other entities in equal or unequal proportions, and on such terms and conditions, whether outright or in trust, as she may elect.

To the extent this general power of appointment is not exercised, my Trustee shall divide the remaining trust property into separate shares for the then living descendants of BEVERLEY J. SOPAK, per stirpes.

If BEVERLEY J. SOPAK has no then living descendants, my Trustee shall divide the remaining trust property into separate shares for my then living descendants, per stirpes.

If I have no then living descendants, my Trustee shall distribute the remaining trust property as provided in Article Ten of this agreement.

**d. Distribution of Trust Share for JOHN R. MILLER**

**1. Outright Distribution**

The trust share for JOHN R. MILLER shall be distributed outright and free of trust.

**2. Distribution on the Death of JOHN R. MILLER**

JOHN R. MILLER shall have the unlimited and unrestricted general testamentary power to appoint the entire principal and any accrued and undistributed net income of his trust share as it exists at his death.

**Exhibit 3 Page 8 of 13**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

JOHN R. MILLER shall exercise this general power of appointment by a valid last will and testament, a valid living trust agreement, or any other notarized written instrument signed by him. In exercising this general power of appointment, he shall specifically refer to this power.

JOHN R. MILLER shall have the sole and exclusive right to exercise the general power of appointment.

This general power of appointment specifically grants to JOHN R. MILLER the right to appoint property to his own estate. It also specifically grants to JOHN R. MILLER the right to appoint the property among persons, corporations, or other entities in equal or unequal proportions, and on such terms and conditions, whether outright or in trust, as he may elect.

To the extent this general power of appointment is not exercised, my Trustee shall divide the remaining trust property into separate shares for the then living descendants of JOHN R. MILLER, per stirpes.

If JOHN R. MILLER has no then living descendants, my Trustee shall divide the remaining trust property into separate shares for my then living descendants, per stirpes.

If I have no then living descendants, my Trustee shall distribute the remaining trust property as provided in Article Ten of this agreement.

**e.    Afterborn Children**

If, after the creation of my trust, I have any additional children or legally adopt any children who are under the age of 18, such child who survives me shall share equally with my other children, and my Trustee shall create a share for such child which shall be administered and distributed on the same terms and conditions as the trust shares created for my other children under this Article.

## Section 3.    Share of a Descendant of a Deceased Beneficiary

Each share set aside for a deceased beneficiary, if any, who has then living descendants shall be divided, administered, and distributed as follows:

9-5

**Exhibit 3 Page 9 of 13**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

### a. Division into Separate Shares

The share set aside for a deceased beneficiary shall be divided into as many shares as shall be necessary to create one equal share for each of the deceased beneficiary's descendants, per stirpes.

### b. Distribution of Descendants' Share

If any descendant of my deceased beneficiary is over 25 years of age and is not legally disabled or incapacitated as defined in Article Fifteen of this agreement, my Trustee shall administer that descendant's share according to the terms of Section 4 below.

### c. Retention of a Minor's or Disabled Descendant's Share in Trust

If any descendant of a deceased beneficiary is under 25 years of age, or if any descendant of a deceased beneficiary is legally disabled or incapacitated as defined in Article Fifteen of this agreement, then my Trustee shall retain such share in trust under the provisions of Article Eleven.

If the disability or incapacity as defined Article Fifteen of this agreement ceases, and if the descendant of a deceased beneficiary is over 25 years of age, then my Trustee shall administer that descendant's share according to the terms of Section 4 below.

## Section 4. Retention of Distributions in Trust

The trust share of any person not specifically named in Section 2, nor otherwise directed to be administered under Article Eleven, shall be administered as a separate trust for that person under the terms and conditions of this Section. Also, whenever a total or partial distribution of trust principal is authorized or required to be made outright and free of trust by a provision of this Article (or any subsequent Article of my trust) to any beneficiary, my Trustee shall have the power, in its sole and absolute discretion, to retain such distribution in trust, to be held and administered as follows:

9-6

**Exhibit 3 Page 10 of 13**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

### a. The Beneficiary's Right to Income

My Trustee, during the lifetime of the beneficiary, shall distribute to or apply for the benefit of the beneficiary from time to time and at the beneficiary's written direction all of the net income from this trust.

### b. The Beneficiary's Right to Withdraw Principal

My Trustee shall distribute to or apply for the benefit of the beneficiary such amounts from the principal as the beneficiary may at any time request in writing.

No limitation shall be placed on the beneficiary as to either the amount of or reason for such invasion of principal.

### c. Principal Distributions in My Trustee's Discretion

My Trustee may also distribute to or apply for the benefit of the beneficiary as much of the principal of the trust as my Trustee, in its sole and absolute discretion, shall consider necessary or advisable for the health, education, support, and maintenance of the beneficiary.

### d. Guidelines for Discretionary Distributions

With regard to my Trustee's discretionary authority over the distribution of income or principal to the beneficiary it is my desire that my Trustee be liberal in exercising such discretion.

I also desire that my Trustee give assistance to the beneficiary for:

The purchase of a residence.

The purchase, establishment or continuance of a business or professional practice.

Any other extraordinary opportunity or expense deemed by my Trustee to be in the beneficiary's best interest.

In making discretionary distributions to the beneficiary, my Trustee shall be mindful of, and take into consideration to the extent it deems necessary, any additional sources of income and principal available

Exhibit 3 Page 11 of 13

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

to the beneficiary, which arise outside of this agreement and are known to my Trustee.

It is my express desire that my Trustee take into consideration the future probable needs of the beneficiary prior to making any discretionary distributions hereunder.

I would ask that my Trustee, before making distributions to the beneficiary, remind him or her of the long-term income tax deferral advantage of retaining funds inside any retirement plan.

Further, I would also ask that my Trustee, before making distributions to the beneficiary, remind him or her of any long-term advantages of retaining assets in a trust share.

### e. A Beneficiary's General Testamentary Power of Appointment

The beneficiary shall have the unlimited and unrestricted general testamentary power to appoint the entire principal and any accrued and undistributed net income of the trust share as it exists at the beneficiary's death.

The beneficiary shall exercise this general power of appointment by a valid last will and testament, a valid living trust agreement, or any other notarized written instrument signed by the beneficiary. In exercising this general power of appointment, the beneficiary shall specifically refer to this power.

The beneficiary shall have the sole and exclusive right to exercise the general power of appointment.

This general power of appointment specifically grants to the beneficiary the right to appoint property to his or her own estate. It also specifically grants to the beneficiary, the right to appoint the property among persons, corporations or other entities in equal or unequal proportions, and on such terms and conditions, whether outright or in trust, as he or she may elect.

Any property in the trust share which is not distributed pursuant to the exercise of the general power of appointment shall be distributed to the beneficiary's then living descendants, per stirpes.

Exhibit 3 Page 12 of 13

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

If the beneficiary has no then living descendants, my Trustee shall distribute the balance of the trust property to my then living descendants, per stirpes.

If I have no then living descendants, my Trustee shall distribute the remaining trust property as provided in Article Ten of this agreement.

Exhibit 3 Page 13 of 13

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# CITY AND COUNTY OF
# SAN FRANCISCO

**CERTIFICATE OF DEATH**

3052012167074 — STATE FILE NUMBER     3201238004061 — LOCAL REGISTRATION NUMBER

| Field | Value |
|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) | JOSEPH |
| 2. MIDDLE | JOHN |
| 3. LAST (Last) | MILLER |
| AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST) | |
| 4. DATE OF BIRTH mm/dd/ccyy | 05/19/1940 |
| 5. AGE Yrs. | 72 |
| 6. SEX | M |
| 6. BIRTH STATE/FOREIGN COUNTRY | IN |
| 10. SOCIAL SECURITY NUMBER | 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 |
| 11. EVER IN U.S. ARMED FORCES? | NO |
| 12. MARITAL STATUS | DIVORCED |
| 7. DATE OF DEATH mm/dd/ccyy | 09/07/2012 |
| 8. HOUR | 1000 |
| 13. EDUCATION | BACHELOR |
| 14/15. WAS DECEDENT HISPANIC/LATINO(a)/SPANISH? | NO |
| 16. DECEDENT'S RACE | CAUCASIAN |
| 17. USUAL OCCUPATION | REALTOR |
| 18. KIND OF BUSINESS OR INDUSTRY | REAL ESTATE |
| 19. YEARS IN OCCUPATION | 45 |
| 20. DECEDENT'S RESIDENCE | 30 MERLIN COURT |
| 21. CITY | OAKLAND |
| 22. COUNTY/PROVINCE | ALAMEDA |
| 23. ZIP CODE | 94605 |
| 24. YEARS IN COUNTY | 54 |
| 25. STATE/FOREIGN COUNTRY | CA |
| 26. INFORMANT'S NAME, RELATIONSHIP | DEBORA MILLER, DAUGHTER |
| 27. INFORMANT'S MAILING ADDRESS | 9369 NEWINGTON WAY, ELK GROVE, CA 95758 |
| 28. NAME OF SURVIVING SPOUSE/SRDP—FIRST | - |
| 29. MIDDLE | - |
| 30. LAST (Birth Name) | - |
| 31. NAME OF FATHER/PARENT—FIRST | LOUIS |
| 32. MIDDLE | JENNINGS |
| 33. LAST | MILLER |
| 34. BIRTH STATE | IN |
| 34. NAME OF MOTHER/PARENT—FIRST | PHERNE |
| 35. MIDDLE | JACQUELINE |
| 36. LAST (Birth Name) | DAVIES |
| 36. BIRTH STATE | OH |
| 38. DISPOSITION DATE mm/dd/ccyy | 09/20/2012 |
| 39. PLACE OF FINAL DISPOSITION | MOUNTAIN VIEW CEMETERY, 5000 PIEDMONT AVENUE, OAKLAND, CA 94611 |
| 41. TYPE OF DISPOSITION(S) | BU |
| 42. SIGNATURE OF EMBALMER | DOUGLAS PAUL COLEY |
| 43. LICENSE NUMBER | EMB8148 |
| 44. NAME OF FUNERAL ESTABLISHMENT | HULL'S WALNUT CREEK CHAPEL |
| 45. LICENSE NUMBER | FD250 |
| 46. SIGNATURE OF LOCAL REGISTRAR | TOMAS ARAGON, MD, Dr.P.H. |
| 47. DATE mm/dd/ccyy | 09/14/2012 |
| 101. PLACE OF DEATH | UCSF MEDICAL CENTER |
| 102. IF HOSPITAL, SPECIFY ONE | IP |
| 103. IF OTHER THAN HOSPITAL, SPECIFY ONE | |
| 104. | SAN FRANCISCO |
| 105. FACILITY ADDRESS | 505 PARNASSUS AVENUE |
| 106. CITY | SAN FRANCISCO |

**107. CAUSE OF DEATH**

| | | Time Interval |
|---|---|---|
| IMMEDIATE CAUSE (A) | RESPIRATORY DISTRESS | MOS |
| (B) | METASTATIC TO LIVER AND LUNGS | MOS |
| (C) | COLORECTAL ADENOCARCINOMA | MOS |
| (D) | | |

| 108. DEATH REPORTED TO CORONER | NO |
| 109. BIOPSY PERFORMED? | NO |
| 110. AUTOPSY PERFORMED? | NO |
| 111. USED IN DETERMINING CAUSE? | |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 | NONE |
| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? | NO |
| 114A. IF FEMALE, PREGNANT IN LAST YEAR? | |

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | |
| 115. SIGNATURE AND TITLE OF CERTIFIER | CYNTHIA LYNN FENTON M.D. |
| 116. LICENSE NUMBER | G71207 |
| 117. DATE mm/dd/ccyy | 09/12/2012 |
| Decedent Attended Since / Decedent Last Seen Alive | 09/04/2012 / 09/07/2012 |
| 118. TYPE/PRINT PHYSICIAN'S NAME, MAILING ADDRESS, ZIP | CYNTHIA LYNN FENTON M.D. 505 PARNASSUS AVENUE, SAN FRANCISCO, CA 94143 |
| 119. MANNER OF DEATH | |
| 120. INJURED AT WORK? | |
| 121. INJURY DATE mm/dd/ccyy / 122. HOUR | |
| 123. PLACE OF INJURY | |
| 124. DESCRIBE HOW INJURY OCCURRED | |
| 125. LOCATION OF INJURY | |
| 126. SIGNATURE OF CORONER / DEPUTY CORONER | |
| 127. DATE mm/dd/ccyy | |
| 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER | |

| STATE REGISTRAR | A | B | C | D | E | *0 1000 1002 153009* | FAX AUTH# | CENSUS TRACT |

STATE OF CALIFORNIA, CITY AND COUNTY OF SAN FRANCISCO
This is to certify that the image reproduced hereupon is a true copy of the record on file in the SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH as of the date issued.

DATE ISSUED    SEP 21 2012

*003278296*

Tomás Aragón, M.D., Dr.P.H.
Health Officer and Local Registrar

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the City and County Health Officer.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

Exhibit 4 Page 1 of 1

# THIRD AMENDMENT
## TO THE JOSEPH J. MILLER LIVING TRUST

WHEREAS, the undersigned has previously established a Trust, with Joseph J. Miller as both Trustmaker and Trustee, known as The Joseph J. Miller Living Trust created by that certain Trust Agreement dated October 8, 2007;

WHEREAS, on January 7, 2011, the Trustmaker amended the Trust for the first time. Trustmaker confirms and ratifies the content of this first amendment;

WHEREAS on May 1, 2012 the Trustmaker amended the Trust for the second time. Trustmaker confirms and ratifies s the content of this second amendment

WHEREAS: Reservation of Powers, Article Four, Section 1, Subsection d., on page 4-2 of the Trust Agreement, the undersigned reserved to himself the right and power to alter, amend or revoke said Trust Agreement in whole or in part, at any time or from time to time by instrument in writing delivered to the Trustee;

WHEREAS, the undersigned presently desires to create the Third Amendment to The Joseph J. Miller Trust;

**NOW, THEREFORE, the undersigned hereby amends**

**Article Seven, "Distribution of My Tangible Personal Property and Specific Distributions" Section 2 as follows:**

Section 2.       Business Personal Property

My Trustee shall distribute my business, Pacific Park Realty or any subsequent formation or secondary configuration of this business, including any tangible personal property which my Trustee, in its sole and absolute discretion, determines to be part of, or used exclusively in Pacific Park Realty, except for vehicles, in equal shares to my four children: Kimberley Miller, Beverley Sopak, John Miller and Debora Miller. Any property passing under this section shall be subject to all debts, liens, mortgages and all other encumbrances on the property. If any of my children shall predecease me, their share shall be distributed to their issue by right of representation.  If they have no issue, then their share shall augment the share of my other children.

**NOW, THEREFORE, the undersigned hereby amends**

**Article Seven, "Schedule of Specific Distributions of Trust Property" Section 14, Section 15 and Section 16 as follows:**

Third Amendment to the Joseph J. Miller Trust
Page 1 of 4

**Exhibit 5 Page 1 of 4**

14. My real property located at 549 Lakeshore Boulevard, Unit 29 in Incline Village, Nevada, including its furnishings, (Unit 29), my Cobalt boat, my Marriott Timeshare and cash in the amount equal to 24 months of monthly fees of the Crystal Shores East Home Owners Association regarding Unit 29 and 24 months of mortgage payment regarding Unit 29 shall be retained in a Sub-Trust named the Tahoe Sub-Trust. The assets shall be retained in the Tahoe Sub-Trust subject to any encumbrances thereon and the Trustee may rent the assets to produce income. The Tahoe Sub-Trust will be governed by the provisions set forth in the Joseph J. Miller Living Trust dated October 8, 2007 as amended, except that the Tahoe Sub-Trust will distribute fifteen years after my date of death in equal shares to my four children by right of representation: Kimberley Miller, Debora Miller, Beverley Sopak and John Miller.

15. My son, John Miller, has previously borrowed money from me in the amount of five hundred thousand dollars ($500,000) as evidenced by a Promissory Note dated October 1, 2010. Any amount of that obligation or any other obligation of John Miller to me or to my Trust that he has not paid back shall by paid back from his distribution from the remainder of my estate (See Article Nine, Section 1).

16. If a beneficiary of a specific gift under this Trust, as amended, wishes to sell his or her interest in a specific gift, then the beneficiary must offer a right of first refusal to my other children, by right of representation.

**NOW, THEREFORE, the undersigned hereby amends**

**Article Nine, "Distribution of My Trust Property" Section 2 as follows:**

Section 2.          Distribution of Shares for my Living Children

My son, John Miller, has previously borrowed money from me in the amount of five hundred thousand dollars ($500,000) as evidenced by a Promissory Note dated October 1, 2010. Any amount that John Miller has not paid back to me shall be considered an asset of the trust estate in the form of a debt owed to the trust estate and shall be paid back using John Miller's distributive share of the residuary created for him in this trust document. The burden of proving any amounts paid back remains with my son, John Miller. The dollar amounts used in the following paragraphs assume that at the time of my death, the obligation of my son, John Miller, for $500,000 remains. If John Miller is able to prove to the trustee with satisfactory evidence that he has paid all or a portion of his debt to me or my Trust, and/or if his debt to me or my Trust is greater than $500,000, then the $500,000 debt dollar amount in the following paragraphs shall be adjusted accordingly.

So long as the value of my estate after allocation of trust administration related expenses and excluding all specific gifts otherwise defined in this trust, i.e. the residuary, is valued



**Exhibit 5 Page 2 of 4**

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

under two million dollars ($2,000,000) at the time of my death, one equal share shall be created for each of my three daughters: Kimberley Miller, Debora Miller and Beverley Sopak and one equal share for my previous wife, Gail Miller. No share shall be created for my son John Miller.

To the extent that the value of my estate after allocation of trust administration related expenses and excluding all specific gifts otherwise defined in this trust, i.e. the residuary, is valued over two million dollars ($2,000,000) at the time of my death, distribution of the first $2,000,000 shall be effectuated by the provisions of the preceding paragraph. For any amount over $2,000,000, one equal share shall be created for each of my children: Kimberley Miller, Debora Miller, Beverley Sopak and John Miller and one equal share for my previous wife, Gail Miller.

Each equal share of the residuary of my Trust created for my then living children and each equal share created for my deceased children who has then-living children shall be distributed outright, free and clear of trust. If one of my children has predeceased me and leaves no then-living children, his or her share shall lapse and be distributed with the residuary of my estate. The equal share created for my previous wife, Gail Miller, shall remain in trust and be held and administered pursuant to the following Sections. If Gail Miller shall predecease me, her share shall lapse and be distributed with the residuary of my Trust.

In every other respect, the Trustor confirms and ratifies the terms of the Trust as stated in that certain Declaration of Trust Agreement dated October 8, 2007, as amended January 7, 2011 and as amended May 1, 2012.

Executed this _2_ day of _June_, 2012 at _Or'sda_ California.

Trustor:                     Trustee:

_Joseph J. Miller_              _Joseph J. Miller_
Joseph J. Miller                  Joseph J. Miller

DocuSign Envelope ID: 9599830A-99F2-4B40-AA74-8A8C744EA2A6

STATE OF CALIFORNIA          )
COUNTY OF <u>CONTRA COSTA</u>     )

On _____ 6.2 _____, 2012 before me, _____ M. MARCUCCI _____,
a notary public, personally appeared Joseph J. Miller, who proved to me on the basis of
satisfactory evidence to be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacity, and that by his
signature on the instrument the person, or the entity upon behalf of which the person acted,
executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*M. Marcucci*

Notary Public

**M. MARCUCCI**
COMM. #1849723
NOTARY PUBLIC · CALIFORNIA
CONTRA COSTA COUNTY
My Comm. Expires May 17, 2013

Third Amendment to the Joseph J. Miller Trust
Page 4 of 4

Exhibit 5 Page 4 of 4